# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

ALFONSO IGNACIO MORALES,
Defendant and Appellant.

S136800

Los Angeles County Superior Court
VA-071974

August 10, 2020

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Groban concurred.

PEOPLE v. MORALES

S136800

Opinion of the Court by Kruger, J.

A jury convicted defendant Alfonso Ignacio Morales of four counts of first degree murder (Pen. Code, § 187) and other crimes. For each murder, it found true the special circumstances that Morales committed multiple murders and murder in the commission of a burglary. (*Id.*, § 190.2, subd. (a)(3), (17).)[1] The jury returned a verdict of death. This appeal is automatic. (*Id.*, § 1239, subd. (b).) We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 13, 2002, the bodies of Miguel Ruiz (who was known as Mike), Maritza Trejo, Ana Martinez, and Jasmine Ruiz were discovered in the home they shared.[2] Mike, Maritza, and Ana had been fatally stabbed. Jasmine, who was then eight years old, had been sexually assaulted and died from asphyxiation. Morales was linked to the murders through physical evidence, including shoe prints and a palm print found at the home, fingerprints found on goods stolen from the home,

---

[1] For one of the four murders, the jury also found true the special circumstances of murder involving torture, a lewd act on a child under the age of 14, and sexual penetration by force. (Pen. Code, § 190.2, subd. (a)(17), (18).)

[2] Because several of the victims and witnesses shared the same last names, we will occasionally refer to them by their first names. We intend no disrespect to any of the individuals in question.

DNA found on Jasmine's body, and bloody clothes and knives located on Morales's property. Morales also admitted to law enforcement officers that he had been in the house at the time of the murders, though he denied committing them.

Morales was charged with four counts of first degree murder (counts 1–4; Pen. Code, § 187, subd. (a)); one count of first degree robbery (count 5; *id.*, § 211); one count of first degree burglary (count 6; *id.*, § 459); one count of a forcible lewd act upon a child (count 7; *id.*, § 288, subd. (b)(1)); and one count of sexual penetration by a foreign object (count 8; *id.*, § 289, subd. (a)(1)). Morales was also charged with the following special circumstances: multiple murders (counts 1–4; *id.*, § 190.2, subd. (a)(3)); murder in the commission of a robbery (counts 1–4; *id.*, § 190.2, subd. (a)(17)(A)); murder in the commission of a burglary (counts 1–4; *id.*, § 190.2, subd. (a)(17)(G)); murder by torture (count 4; *id.*, § 190.2, subd. (a)(18)); murder in the commission of a lewd act upon a child under the age of 14 (count 4; *id.*, § 190.2, subd. (a)(17)(E)); and murder in the commission of sexual penetration by a foreign object, force, and violence (count 4; *id.*, § 190.2, subd. (a)(17)(K)). Finally, Morales was charged with the following enhancements: personal use of a deadly and dangerous weapon in commission of a felony (counts 1–3, 5, and 6; *id.*, § 12022, subd. (b)(1)); great bodily injury on a person 70 years of age or older (count 3; *id.*, § 12022.7, subd. (c)); use of force, violence, duress, menace, and fear of immediate and unlawful bodily injury (count 7; *id.*, § 1203.066, subd. (a)(1)); substantial sexual contact with a victim who is under 14 years of age (count 7; *id.*, § 1203.066, subd. (a)(8)); and great bodily injury (counts 7–8; *id.*, § 12022.8).

The jury convicted on all counts and found true the special circumstances of multiple murders and murder in the

commission of a burglary on all four murder counts. With respect to count 4, concerning Jasmine's murder, the jury also found true the special circumstances of murder by torture, murder in the commission of a lewd act upon a child under the age of 14, and murder in the commission of sexual penetration by a foreign object, force, and violence. In addition, the jury found true several enhancement allegations: personal use of a deadly and dangerous weapon in commission of a felony (on counts 1, 2, 3, and 6); use of force, violence, duress, menace, and fear of immediate and unlawful bodily injury (count 7); substantial sexual contact with a victim who is under 14 years of age (count 7); and great bodily injury (counts 7 and 8). At the penalty phase, the jury returned a verdict of death. The superior court sentenced Morales to death.

## A. Guilt Phase Evidence

In 2002, Mike lived with his common law wife Maritza, his grandmother Ana, his stepdaughter Maritza Raquel Trejo (who was known as Raquel), and his and Maritza's eight-year-old daughter Jasmine in a three-bedroom home in Whittier. Jasmine and Raquel shared a bedroom. Morales, who was in his mid-20's at the time, lived around the corner from the family. Morales and Mike were friends; Morales would visit the family's home almost every day to hang out with Mike.

On his visits, Morales sometimes briefly interacted with Raquel and Jasmine, usually sharing just quick hellos. But on one occasion Morales made Raquel uncomfortable by standing in the backyard, staring at her through her bedroom window, and asking her to come outside. After the encounter, Morales apologized to Mike and Maritza and bought the whole family dinner. Morales also once asked Raquel on a date, and she said

"maybe," though she did not want to go out with him, so she avoided him on the night of their date. Thereafter, she felt uncomfortable around him and began staying in her room whenever he came over to the family's house.

Sometimes when Morales visited Mike at home, he would drive his car (a green Mustang), though he lived just down the street. Hector Alvarez, a neighbor of the family, would see Morales's Mustang at the house approximately four days a week. About two months before the murders, Alvarez stopped seeing Morales's car in front of the family's house, and about a month before the murders, he stopped seeing Morales at the house. Raquel also realized about a week before the murders that Morales had stopped coming to the house.

The murders occurred sometime after 9:00 p.m. on Thursday, July 11, 2002, and before 8:30 a.m. on Friday, July 12, 2002. Mike and Maritza were last seen alive between 8:30 and 9:30 p.m. on Thursday night, when one of Mike's friends visited them at their home for 15 to 30 minutes. Raquel spent the night at her uncle's house that night. The family's back-door neighbor, Doris Morris, saw a step stool against the wall of her property that abutted the family's property on either Thursday or Friday morning: At trial in 2005, Morris testified she saw the stool on Thursday morning at around 8:00 a.m. and moved it at about noon, but in an interview with law enforcement officers on Saturday, July 13, 2002, Morris said she had seen the stool on Friday morning at around 6:00 a.m. and moved it at about 11:00 a.m. Morris's backyard was not enclosed, so someone could walk directly from Morris's backyard to Morales's house down the street.

Between 8:00 and 8:30 a.m. on Friday, Mike's father and his father's wife stopped by the family's house. They knocked on the front door and on Ana's bedroom window, but no one answered, so they left after about five to 10 minutes. It was unusual for everyone to be asleep so late. Mike did not show up to work at 9:00 a.m., even though he had a scheduled meeting at that time with Harold Suarez, a distant relative and customer, and was usually very punctual. At around 9:15 a.m., Suarez called Mike's cell phone; someone answered the phone, waited for a few seconds without speaking, and then hung up. Suarez called again five to 10 minutes later and the same thing happened. At various times throughout the rest of the day, Raquel and Mike's sister-in-law, Kenelly Zeledon, attempted to call Mike, but they could not reach him. At about 9:00 p.m., Raquel went to her house with her uncle. Her parents' cars were in the driveway, but all of the house doors were closed, and the curtains were shut. She knocked on the doors, but no one answered. She left the home between 10:00 and 10:30 p.m. to stay at Zeledon's house.

At 11:00 p.m. on Friday, Leopoldo Salgado, a local bar manager, saw Morales at the bar. Morales, who visited the bar frequently but did not drink, asked to talk to Salgado. Salgado asked Morales to wait until closing, after which Morales left the bar. At around 2:00 a.m., Salgado saw Morales sitting in his car in the bar parking lot, but Salgado did not have time to talk at length with Morales.

On Saturday, July 13, 2002, at around 6:00 a.m., Doris Morris saw a large trash barrel and step stool against her wall abutting the family's property. The step stool was different than the one she had seen previously. When she went outside at 6:15 a.m., both the stool and the barrel were gone.

On Saturday morning, around 11:00 a.m., after failing to reach Maritza by phone, Raquel and Zeledon returned to Raquel's house. No one responded when Raquel knocked, so she jumped over the fence and entered the home through the unlocked kitchen door at the back of the house. She found the house in complete disarray, with blood and food items on the walls and floors, towels on the floors, furniture moved, and items missing from Mike's office. Raquel went outside and told her aunt about the state of the home. Zeledon entered the home and noted the disorder. In Mike's office, she found blood all over, items moved around, and a pair of pants on the floor, which was strange because Mike was usually tidy. In the master bedroom, she noticed furniture had been moved. And in Jasmine and Raquel's room, there was honey all over the furniture. She then walked into Raquel and Jasmine's bathroom and saw Jasmine's lifeless body in the bathtub. On top of Jasmine was a large statue that covered almost the entire length of her body. She also had blood running down her leg. Zeledon then entered Ana's bedroom, where she found the bodies of Mike, Maritza, and Ana. Mike was wearing only underwear (which Raquel testified was unusual), Maritza was wearing a tank top and shorts, and Ana was wearing a nightgown. Zeledon exited the house, told Raquel what she had found, and asked a neighbor to call 911.

The police arrived and began documenting and collecting evidence. They found blood all over the house. In the entryway, the walls and door had blood spatter and smears. In the living room, they found blood spatter and pooled blood on the floor, as well as potential handprints on the sofa, which was smeared with blood. There also was a trail of blood with drag marks leading out of the living room toward the bedrooms. It appeared

6

as if someone had tried to clean up some of the blood; there were diluted blood smears, towels on the floor, and a bucket of liquid and a mop. In the office, there were multiple blood stains on the walls. Police found a bloody hoop earring under the desk, which matched an earring Maritza was found wearing. In a hamper in the bathroom by the office, the police found a shirt and shorts with blood stains. In the bathroom where Jasmine's body was found, there were bloodstains on the floor and sink and in the bathtub. The tub also had a soap scum ring around its interior, indicating it had been drained.

The police also documented several pieces of physical evidence. Tomato paste, barbeque sauce, and honey had been poured all over the walls and on the bed linens. The police discovered a six-to-eight-inch-long purple sex toy in the bathtub, between Jasmine's legs. In the closet of Mike's office, the police found an empty package that might have contained the sex toy. They found pieces of orange cord on the bathroom floor, on the bed in the master bedroom, and underneath Ana's body. On the bodies of Mike and Maritza, they found a bottle and cleaner-like substance. The police also took shoe impressions from multiple locations in the home, including from a wooden chair found in the girls' bedroom.

In addition to documenting and collecting evidence at the scene, officers began investigating potential leads. This effort led them to Morales's home. One officer noticed shoe prints near Morales's front door that appeared similar to the impression discovered on the wooden chair in the girls' bedroom. During their conversation with Morales, the officers asked to see the bottom of Morales's boots. Believing the shoes might match the impression from the chair, the officers asked Morales to come to

the station for an interview.  Morales agreed.  This interview was the first of three interviews of Morales.

In this first interview, Morales denied knowing anything about the murders.  During the course of the interview, he mentioned that he was not allowed in the girls' bedroom.  He agreed to give the officers his boots and consented to a search of his house.  After the interview, while officers transported him to a different police station, Morales admitted that he was in the victims' house when they were murdered.

Morales was then interviewed a second time.  He told the officers he went to the family's house on Wednesday night (later, he said he was not sure of the day) around 8:00 p.m. and saw through the office window two men with guns talking to Mike. The men called Morales inside, taped his hands, and put him in the living room.  Then they began killing the family.  The men started in the office with Mike, who then came into the living room with his throat bleeding.  They then attacked Maritza, who had been in the kitchen making coffee, and she died in the living room.  They then killed Ana, who had been in her bedroom.  And they finished by assaulting and killing Jasmine in the back of the house.  The men directed Morales to make a mess in the house and told him to take Mike's computer equipment. Morales put the stolen items into a large trash barrel and dragged it to his house.

In his third interview, Morales mostly repeated the same story, but this time he stated that the events took place on Thursday night at 8:00 p.m., and he said Ana was in the living room when the men killed her and that they dragged her, Mike, and Maritza to the back of the house.  He also told officers that he went to Mike's home that night to repay him $50 of a $100

debt. He mentioned that Mike had asked him not to ask Raquel on a date again after the window incident and that he complied with this request. Morales said that after the men finished killing the victims, they threatened to kill him if he told anyone what had happened, but they allowed him to leave. Morales continued to deny having participated in the killings.

Significant physical evidence connected Morales to the crime. The police conducted a sexual assault examination of Jasmine, and sperm found in Jasmine's anus conclusively matched Morales's DNA profile; sperm found in her vagina was consistent with Morales's DNA. Morales's palm print was found on the handle of the mop located in the entryway. Morales's shoe matched the impression found on the wooden chair in the girls' bedroom. Blood from the tip of Morales's shoelace matched Maritza's profile, and Mike was a possible contributor. In Morales's shed, they found the trash barrel with electronics from the family's home. Morales's fingerprints were on many of the items in the barrel. And in Morales's bedroom, officers found a model car and watches that belonged to Mike, jewelry, and a little girl's wristwatch.

Later that year, in October 2002, Morales's stepfather found two ammunition boxes underneath a woodpile in Morales's backyard. One of the boxes contained, among other things, bloody clothes, including boxers, and a six-inch Vaquero folding knife. The other box contained similar items, including a black jacket, a dagger in a sheath, a five-inch United knife in a sheath, and two bloody fingerless gloves. Morales's stepfather identified several of these items (but not the knives) as belonging to Morales. Blood on the United knife handle matched Maritza's DNA profile, with Morales as a possible contributor; blood on the Vaquero knife matched Mike's profile,

9

with Maritza as a possible contributor. The base of the third knife tested negative for blood, but the wooden handle yielded weak positive results. Blood on the jacket matched Maritza's profile, with Morales as a possible contributor. Sperm cells on the boxers matched Morales's profile, while blood and an epithelial cell were consistent with both Jasmine's and Morales's profiles.

Medical examiners conducted autopsies of each of the four victims. Mike had multiple sharp-force injuries on his body, including on his neck and back. The cause of death was a slicing wound to the front of his neck, which severed his jugular veins. Such a wound is not immediately fatal and could have given Mike time to stagger a few feet before collapsing. The wound to his neck was consistent with an attack from behind. One of his wounds was consistent with a double-edged knife and another was consistent with a single-edged knife, indicating that the attacker had used two different knives. Mike had no defensive wounds. A postmortem injury to his right wrist was consistent with being dragged with a cord after death.

Maritza was stabbed 31 times and cut 14 times; some injuries were consistent with a single-edged knife while others were consistent with a double-edged knife. She had at least five fatal wounds — on her neck, chest, and back — and the injuries were consistent with someone who had struggled with and fled her attacker. Some of the wounds were clustered on various parts of her body, including her neck and back.

Ana suffered two fatal sharp-force wounds to her neck; the wounds were consistent with an attacker holding two different weapons. Ana also had a blunt-force injury to her scalp and other minor injuries, but no defensive wounds.

Jasmine died from asphyxiation, either by body compression or drowning. Dried foam found around her nose and mouth suggested she had been drowned. She also had small petechiae (tiny hemorrhages on the skin) all over her neck and face, suggesting body compression on the upper chest. Extensive injuries to her genitalia and anus, including severe tearing, stretching of the skin, hemorrhaging, and bruising, suggested the use of extreme force by a blunt object. She also suffered other minor injuries, including fingernail marks on her ankle and genitals, scratches on her thighs, and small abrasions on her left buttock and foot. She likely suffered these injuries while alive, but she may or may not have been conscious.

The prosecution called Sheriff's Deputy Paul Delhauer to testify as a crime scene reconstruction expert. Delhauer had examined between 800 and 900 cases in his career and had frequently analyzed blood spatter, knife wounds, and blood stains. Delhauer testified to the potential relative locations and sequence of the murders, as well as the manner of the killings, based on his analysis of the reports and documents in the case, personal observations made at the scene, blood stains and spatter in the home, the autopsy reports, other physical evidence found in the home, and his own experiments. He also testified that the crime scene appeared to have been staged to mislead investigators about what had occurred.

The defense presented one guilt phase witness, investigator Richard Salazar. Salazar testified that an object Delhauer had identified as a bidet hose, which Delhauer suggested might have been used to cleanse Jasmine's vaginal and rectal areas, was actually a hose that attached to a hookah pipe, which was used for smoking tobacco and other substances.

## B.  Penalty Phase Evidence

During the penalty phase, the People called several family members of the victims to provide victim impact evidence: Raquel, Zeledon, Mike Rodriguez, Sr. (Mike's father and Ana's son), Luz Ruiz (Rodriguez's wife), and Olga Lizzette Ruiz (Mike's sister).  These family members testified about their previous relationships with the victims, the personalities of the victims, and the impact of the murders on their lives.  The People also introduced several pictures of the victims and a one-minute video of Jasmine.

The People introduced two prior criminal act allegations against Morales.  A law enforcement officer testified that while Morales was in jail in December 2002, the officer discovered in Morales's cell a plastic spoon with one side sharpened and a thread wrapped around the handle.  The officer believed this item was a shank, though Morales had claimed he used it to transport written messages to other prisoners (i.e., as a "fishing line").  Another officer testified that in February 2003, he found a contraband razor blade and what he believed to be a homemade handcuff key in Morales's cell.

Morales's witnesses testified about his upbringing, his learning disability, and his record in school and at work.  Morales grew up with his mother, his sister Yvonne, and his brother Emi.  When Morales was young, his father left the family.  After that, many of his mother's subsequent partners were abusive toward Morales.  One partner physically abused Morales.  Another partner, who was an alcoholic, verbally abused Morales starting at the age of 10, mostly about Morales's apparent lack of intelligence.  When Morales was in his teens, Emi died unexpectedly in a rockslide in Yosemite.  Morales was

devastated and became isolated after Emi's death. Yvonne said she would not wish Morales's childhood on anyone. Morales's mother described him as a child in a man's body. He often needed his mother's help doing a variety of tasks, like filling out paperwork.

Morales also struggled in school. As early as the first grade, he was at the bottom of the class. Throughout most of his education, he attended special education classes. His fourth through sixth grade teacher testified that Morales seemed depressed and was not very social. By the eighth grade, Morales was reading at only a first grade level, with a very limited vocabulary. He was withdrawn and dejected and often picked on by other kids. These trends continued in high school.

Two experts testified that Morales had a severe learning disability. While Morales's IQ was average or just below average in certain subjects, he struggled in subjects that required him to express himself. This discrepancy was consistent with someone with a learning disability, as opposed to someone with an intellectual disability. One expert testified that Morales's truancy was likely tied to his learning disability. The second expert confirmed these findings. He concluded that Morales had suffered from long-standing brain damage and learning disabilities. While Morales had an average IQ, he struggled expressing his thoughts. Morales also tended to react impulsively, rather than after considered thought.

On rebuttal, the People introduced evidence that Morales had been dismissed from a vocational program during high school. As part of the program, Morales had tried various jobs and a remedial program. He was fired from his job as a summer camp counselor because he dunked a seven-year-old camper's

head in the toilet. And he was dismissed from the remedial program because he was not attending all of his classes. Because of these incidents and his refusal to abide by the vocational program's requirements, he was eventually dismissed from the program.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Sufficiency of the Evidence of Premeditation and Deliberation

Morales challenges his first degree murder convictions on the ground that the evidence was insufficient to show he committed the murders with premeditation and deliberation. We reject the challenge.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) In so doing, a reviewing court " ' "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' (*People v. Edwards* (2013) 57 Cal.4th 658, 715 [161 Cal.Rptr.3d 191, 306 P.3d 1049].)" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.)

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (Pen. Code, § 187, subd. (a).) If the murder is "willful, deliberate, and premeditated," it is first degree murder. (*Id.*, § 189, subd. (a).) " ' "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' ([*People v. Jurado* (2006) 38 Cal.4th 72, 118].) ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' (*Ibid.*; see also *People v. Anderson* (1968) 70 Cal.2d 15, 24–34 [].) 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' (*People v. Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7].)" (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

In *People v. Anderson, supra*, 70 Cal.2d at page 26 (*Anderson*), we identified "three basic categories" of evidence this court has generally found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"; (2) motive, or "facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim"; and (3) manner of killing, or "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed

according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' . . . ." (*Id.* at pp. 26–27.)

In the years since *Anderson*, " 'we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 324.) *Anderson* provides "a framework to aid in appellate review," but it does not "define the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

Here, focusing on the three *Anderson* categories, Morales argues that the prosecution failed to introduce evidence of planning activity, motive, or a manner of killing sufficient to find he committed the murders with premeditation and deliberation, as opposed to rash impulse. We disagree; sufficient evidence supported a finding of premeditation and deliberation.

As for planning activity, the People presented evidence that Morales surreptitiously entered the victims' home and attacked Mike by surprise before killing the other victims. Specifically, a law enforcement officer testified that the family's back-door neighbor, Doris Morris, had told him on Saturday, July 13, 2002, that she had seen a step stool by her back wall on Friday morning at around 6:00 a.m. (Though Morris testified at trial that she saw the stool at 8:00 a.m. on Thursday, the jury could have believed Morris's contemporaneous statement to be more reliable than her testimony in court several years later.) Further, Mike was wearing only his underwear when he was attacked; Raquel testified that Mike did not walk around the home in his underwear. The fatal slicing wound to Mike's neck was consistent with an attack from behind, and Mike did not

have any defensive wounds. And finally, the evidence showed that Mike was the first victim — indeed, Morales himself told officers as much in his own recounting of the sequence of the murders by unknown third parties. Based on all this evidence, the jury could have inferred that Morales covertly entered the victims' home with a plan to kill Mike before moving on to the other victims.

Morales suggests that the evidence of planning activity was undermined by the fact that no evidence definitively showed he was armed when he entered the victims' home. Although knives used to commit the murders were later found in Morales's backyard, no evidence established that the knives belonged to Morales, as opposed to the victims. The same is true of the bloody fingerless gloves that were found along with the knives in Morales's backyard. But a jury might well consider the very fact that Morales used gloves and three different knives as supporting an inference that Morales did not spontaneously pick up these tools once inside the home, but instead arrived prepared to attack. In any event, even assuming Morales found the knives in the residence rather than arming himself before entry, the evidence of the surprise attack on Mike makes it reasonable to infer that Morales sought out the knives to effectuate that surprise, and did not pick up the three knives out of spur-of-the-moment impulse. (See *People v. Perez, supra*, 2 Cal.4th at p. 1126; *People v. Wharton* (1991) 53 Cal.3d 522, 547.)

The People also supplied evidence of a possible motive. The evidence suggested that a rift had grown between Morales and the victims. Morales had previously made Raquel uncomfortable by standing at her window and staring at her. He also had asked her out, but she avoided him on the night of

their date and then began avoiding him whenever he came over. During his interviews with the police, Morales told them he was not allowed in Raquel and Jasmine's bedroom, and he said that Mike had asked him not to ask Raquel out again after the window incident. Sometime thereafter, about a month before the murders, the family's neighbor, Hector Alvarez, stopped seeing Morales at their home, even though Alvarez had previously seen Morales there about four times a week. Raquel confirmed that about a week before the murders she realized Morales had stopped coming over. Morales also admitted to owing Mike a small sum of money, which he said was the reason he went to the family's house on the morning of the murders. Though there was evidence Morales had apologized for the window incident and had complied with Mike's request to stop seeking to date Raquel, the jury could have inferred from this evidence that Morales and Mike had a falling out regarding Raquel or the money Morales owed Mike, such that Morales was no longer welcome at Mike's home. Based on this evidence, the jury could have determined that Morales had a motive for the murders.

The jury might also have inferred from the evidence that Morales was motivated to kill Maritza, Ana, and Jasmine to "silence [them] as [] possible witness[es]" to the murder of Mike, and in Jasmine's case "to silence her as a possible witness" to her own assault. (*People v. Pride* (1992) 3 Cal.4th 195, 248.) And lastly, Morales stole several expensive items, including watches and computer equipment, from the home, suggesting an additional motive: to steal from the family and then kill them to avoid identification. (See *People v. Perez, supra,* 2 Cal.4th at pp. 1126–1127.)

The manner of killing also supports the jury's finding of premeditation and deliberation. Evidence showed that Mike suffered a fatal slicing wound to his neck from behind, which severed both of his jugular veins. The nature of this injury suggests that it was designed to kill Mike. (See *People v. Booker* (2011) 51 Cal.4th 141, 152, 173 [multiple stab and cut wounds to the neck that severed right carotid artery and jugular vein indicated victim was killed deliberately]; see also *Anderson*, *supra*, 70 Cal.2d at p. 27 ["[D]irectly plunging a lethal weapon into the chest evidences a deliberate intention to kill . . . ."]; *People v. Potts*, *supra*, 6 Cal.5th at p. 1028 [multiple stab wounds to chest suggested killing was premeditated and deliberate].) Likewise, the injuries to Ana and Maritza suggested a deliberate intent to kill. Ana suffered two fatal wounds to her neck, and Maritza suffered 45 stab and cut wounds, some of which were clustered on her neck and back, and at least five of which were fatal wounds delivered to her neck, chest, and back, respectively. (Cf. *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["The jury also fairly could have concluded that defendant was intent upon killing April due to the sheer number of wounds on April's body, many of which individually would have been fatal."]; *People v. Pride*, *supra*, 3 Cal.4th at p. 248 ["Over 40 of the 69 stab wounds were located on [the victim's] chest and back. They were 'clustered' — in some cases 'symmetrically' — on the left side, near the heart. Based on the number and placement of the wounds and the apparent fact that [she] was the second victim, the jury could infer her death was calculated and was not the product of an unconsidered explosion of violence."].) As to Jasmine, there was evidence that she died either from body compression or drowning. From the evidence, the jury could have concluded that Morales put the large statue

on Jasmine's unconscious body in a filled bathtub in order to be certain she would drown, demonstrating a deliberate intent to kill.

The killing of the victims was also prolonged, a fact that "supports an inference of deliberation." (*People v. Sandoval* (2015) 62 Cal.4th 394, 425.) Morales's attacks on both Maritza and Ana involved "multiple weapons" and "numerous stabs and slashes" suggesting the attacks were extended. (*People v. Potts*, *supra*, 6 Cal.5th at p. 1028.) So too with the attack on Jasmine; the evidence tended to show she was assaulted while alive and then killed. Moreover, the evidence showed the attacks " 'occurred in stages,' " as reflected by Morales's own description of the events and demonstrated by the evidence that, after Mike was attacked, Maritza then struggled with his attacker before she, too, was killed. (*Ibid.*, quoting *People v. Streeter* (2012) 54 Cal.4th 205, 244.) And the jury could have interpreted the evidence as showing that Morales had to "travel through the house" to kill the victims. (*Potts*, at p. 1028.) Significant amounts of blood in the office, entryway, and living room suggested attacks occurred in each of those locations. Moreover, Morales's story to the police as well as the location of Jasmine's body suggested Jasmine was killed in the back of the home, as opposed to in the front of the home where the evidence showed the other attacks occurred.

Finally, Morales's actions after the murder could have reasonably contributed to the jury's finding that he committed the murders with premeditation and deliberation. The jury could have reasonably inferred from the evidence that Morales stayed at the home after he murdered Mike to kill the other members of the family, and that, after killing the remaining family members, he stayed to steal items and to "stage" the

crime scene by cleaning up some of the blood and making a mess. He also took the time to hide his bloody clothes, the bloody gloves, and the murder weapons in his backyard. The jury reasonably could conclude these actions were inconsistent with impulsive and rash behavior. (See *People v. Perez, supra*, 2 Cal.4th at p. 1128 ["[T]he conduct of defendant *after* the stabbing, such as the search of dresser drawers, jewelry boxes, kitchen drawers and the changing of a Band-Aid on his bloody hand, would appear to be inconsistent with a state of mind that would have produced a rash, impulsive killing. Here, defendant did not immediately flee the scene."]; *People v. Potts, supra*, 6 Cal.5th at p. 1028 ["Further, a jury could quite reasonably infer that a person who followed a horrific double homicide by opening a package of cookies was not surprised and dismayed by what he had done, as one who acted impulsively might be."]; cf. *People v. Famalaro* (2011) 52 Cal.4th 1, 36 [holding that defendant's choice to hide bloody gloves and murder weapons was an attempt to conceal evidence relevant to premeditation and deliberation of the killing].)

In sum, the evidence of planning, motive, manner of killing, and Morales's actions after the murder, taken together, was sufficient to support the jury's finding that the murders were premeditated and deliberate.

### 2. *Admission of Crime Scene Reconstruction Expert Testimony*

Morales argues that the trial court violated both state evidence law and his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by admitting testimony of the People's crime scene reconstruction expert. We reject the argument.

### a. *Background*

As noted, at trial, the People called Sheriff's Deputy Paul Delhauer as a crime scene reconstruction expert. At a pretrial hearing, defense counsel sought to exclude certain opinions included in Delhauer's expert report. In response, the prosecution signaled it did not intend to solicit Delhauer's opinions on the challenged issues: Delhauer would only testify about crime scene staging, as well as physical items at the scene and evidence of the manner and method of death. Defense counsel noted he had not challenged the portions of the report regarding staging, subject to the prosecution setting a proper foundation for Delhauer's training and experience. The court agreed Delhauer would not be permitted to testify beyond his expertise but stated it would not exclude Delhauer's observations about the crime scene.

The People called Delhauer as their final witness at trial. Delhauer had been a criminal profiler and crime scene analyst (otherwise known as a crime reconstructionist) since 1999. He had a bachelor of arts degree and had taken a college-level physics for health sciences course, but most of his training and experience had come through work. He had worked in various departments of the sheriff's office. In 1995, he spent six months in the coroner's office, where he conducted more than 200 death investigations and saw between 300 and 400 stab wounds. He eventually landed in the homicide bureau, where he was trained in, among other topics, homicides, sexual assault investigations, blood spatter analysis, and crime scene reconstruction. Delhauer examined between 800 and 900 cases, including 70 murder investigations, while in the homicide bureau. Over the course of his career, he had been directly involved in or assisted

in more than 6,000 criminal cases. Since becoming a reconstructionist, he had consulted on more than 300 cases.

Delhauer had also received specific training relevant to crime scene reconstruction, including blood spatter analysis. In addition to training he received through his department, Delhauer took a 40-hour class in which he learned about the dynamics and composition of blood and conducted around 40 experiments aimed at reproducing bloodshed. In his trainings, he also learned about different blood stains and pattern stains. He had conducted nearly 200 of his own reconstruction experiments for his cases, which included experiments on bloodshed, blunt force trauma, and sharp force and stab wounds. Specifically as to knife wounds, he had conducted relevant examinations at the coroner's office, interviewed the surviving victims of knife attacks, and conducted between 40 and 50 of his own experiments with various media, including meat and modeling clay, to reproduce knife wounds. He also continually maintained his education on these issues. He had previously qualified as an expert in Los Angeles County Superior Court eight or nine times.

After describing his experience and training, Delhauer explained how he had prepared to testify as an expert in the case. Before testifying, he had been to the crime scene for an hour and a half on the morning of Saturday, July 13, 2002; read all of the crime reports, interviews, forensic reports, and autopsy reports in the case; examined all of the photographs taken by law enforcement officers and the coroners; and conducted his own experiments.

Delhauer then briefly shared his overarching conclusions about how he believed the murders had been committed. He

believed the victims were killed in the following order: Mike, Maritza, Ana, then Jasmine. Mike had been killed from behind, likely by surprise, as indicated by Mike's lack of defensive wounds and the debilitating slice wound to the front of his neck, which Delhauer believed was Mike's first injury. He believed Mike was attacked in the office. Maritza likely entered Mike's office while or just after Mike was attacked. She was attacked in the office and then chased to the house's entryway, where she was eventually killed. There was less evidence as to how Ana had been killed, but he believed she was the third person murdered. She likely was in the back of the house when she heard sounds and came into the living room. In the living room, blood stains close to a broken statue suggested the assailant might have used the statue to create the blunt force trauma on Ana's head. Finally, he testified that he believed Jasmine had been sexually assaulted and then drowned while unconscious. He based this conclusion on the lack of indicators of strangulation and the lack of evidence of splashing or attempts to escape from under the large statue that had been placed on top of her body in the bathtub.

The rest of Delhauer's testimony was aimed at supporting these conclusions. Delhauer testified about the evidence in the house room by room, beginning with the house's entryway. He first described the blood spatter patterns in the entryway. Defense counsel objected on the grounds of speculation and lack of foundation, but the court overruled the objection. Delhauer testified that the spatter showed that someone had been moving toward the front door and had attempted to open it, at which point the person was attacked and then fell to the ground. Defense counsel again objected, and the parties had a side bar with the court. The court found that Delhauer qualified as an

expert witness, and that he could testify about what he believed had happened, as long as it was based on the evidence (like the blood stains) and it was within his expertise. At that point, the defense lodged a continuing objection for lack of foundation. Delhauer then continued with his analysis of the entryway blood spatter. He concluded by saying he believed the murders had not started in the entryway. He believed the blood was Maritza's. He opined that Maritza had entered the entryway already wounded, tried to open the front door, suffered a continued attack, and fell down to the floor, where she was continually stabbed. She was then dragged away to the back rooms, as indicated by drag marks on the floors.

Delhauer next testified about evidence in Mike's office. Based on blood spatter on clothes on the floor of the office, Delhauer testified Mike had not been wearing the clothes when he was killed. Over a defense objection, Delhauer testified that the blood spatter in the office showed that someone who was bleeding had moved from the office to the living room; he later testified that some of the spatter was consistent with Mike moving out of the room. He concluded that some of the blood spatter in the office was consistent with Mike's fatal neck injury, which he believed had been inflicted from behind. He also testified that one of Morales's knives was consistent with Mike's neck wound. Bloody clothes were found in a hamper in the office bathroom, along with a rubber hose. Delhauer believed the hose was for use with a bidet, which is used to clean the vagina and anus, and that it had been wiped clean of blood. He opined on cross-examination that the hose may have been used to clean Jasmine's vaginal and rectal areas. Maritza's earring was also discovered under the office desk. From this and some blood

spatter on one of the walls, Delhauer concluded Maritza suffered the stab wound to her ear in the office.

Turning to the living room, Delhauer identified certain blood stains as drag marks, which he concluded were made when the assailant dragged the bodies of Maritza and Mike to the back of the house, as also evidenced by the ligature marks on Mike's arm. He also identified one large blood stain and one smaller stain in that room. The larger stain near the couch was consistent with Mike's injury, while the smaller stain may have been made when Ana was killed or when Mike or Maritza was dragged through the area. He testified that the elbow of a human-shaped statue in the living room was consistent with the pattern injury on Ana's head. Delhauer also described how the food items and other random objects strewn about the house suggested someone had staged the crime scene to create a false narrative about what had happened at the scene.

After discussing pictures of Ana's bedroom, where Mike's, Maritza's, and Ana's bodies were discovered, Delhauer discussed pictures of Jasmine in the bathtub and her injuries, and then turned to pictures of Jasmine's bedroom. He opined that an herbal salad dressing stain on Jasmine's bed was consistent in shape with the purple sex toy found in the bathtub between Jasmine's legs. Finally, Delhauer testified about some of the items found in the ammunition boxes in Morales's backyard. Delhauer concluded that two of the three knives found in the boxes had been used in the attack.

On cross-examination, defense counsel elicited the following facts: Delhauer had a liberal arts degree in communications, with no master's degree and no degrees in criminal forensics or science. He believed he had first received

relevant training for his expert testimony in grammar school math and science classes, and then in high school. He had only taken one college-level science course, in physics for health sciences. And he never conducted any autopsies while working at the coroner's office. In preparing to be an expert for this case, he had not viewed the bodies firsthand, spoken to any medical examiners, or looked at any physical evidence other than during his single trip to the victims' home right after the murders. But at the time he visited the house, he was not there in his role as a reconstruction expert, and he did not take any notes.

Delhauer also disagreed with several of the People's medical examiner and criminalist witnesses on a few points. Contrary to the medical examiner's testimony, he believed the attacker had cut Mike's throat with his right hand, not his left. And he believed the wound margins of Mike's wound were serrated, while the medical examiner testified they were clean. His initial conclusions were also contrary to several of the criminalists' testimony, but he said he would be willing to change his opinion on those issues. For example, though he believed there were blood stains in the girls' bedroom and on the bed in the master bedroom, the criminalists testified otherwise.

Finally, defense counsel challenged the bases of some of Delhauer's conclusions. Defense counsel questioned Delhauer's conclusion that the salad dressing stain on Jasmine's bed was made by the sex toy, asking whether the stain was not also consistent with a bottle of dressing found at the scene and exposing that Delhauer had no evidence that the sex toy had ever been placed in dressing. Delhauer also admitted that the blood in the entryway had not been typed, so he could not say it was from only a single person. As to Delhauer's experiments, he had not used the knives in evidence, and he acknowledged that

clay is different than skin and that motion changes the size and shape of wounds, such that he could not perfectly replicate the injuries. Finally, defense counsel asked many questions about Delhauer's conclusion that the hose found in the office bathroom was a bidet hose. Delhauer acknowledged there was no accompanying bidet bag found in the home, no other apparent means of using the hose, and no direct photographs of the item. After the prosecution rested, defense counsel called a single witness, who had spent 13 years in the Los Angeles Police Department's narcotics unit, to testify that tubes like the one found in the house are used with a hookah, a device for smoking tobacco and other substances.

After both sides rested, the parties and the court further discussed Delhauer's testimony. The court again confirmed that Delhauer's blood spatter testimony was probably "appropriate and accurate" and that Delhauer had "an awful lot of on-the-job training." The court noted, however, that Delhauer had "tended to overextend himself" when giving some of his opinions and had "basically [given] an overview of the entire case." But defense counsel had also "done a very effective job of discrediting" Delhauer, and the court told Morales he could argue as much in closing. The court also believed that Delhauer's testimony was "largely cumulative." For these reasons, the court admitted Delhauer's testimony over Morales's renewed objection for lack of foundation and speculation on state and federal constitutional grounds.

### b. *Discussion*

Evidence Code section 720, subdivision (a) provides that a "person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to

qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." The witness's expertise "may be shown by any otherwise admissible evidence, including his own testimony." (*Id.*, § 720, subd. (b).) Evidence Code section 801 provides that "[i]f a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

" 'The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 536.) We find such abuse only where " ' " 'the evidence shows that a witness *clearly lacks* qualification as an expert.' " ' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1063.) " ' " 'Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility.' " ' " (*Nelson*, at p. 536, quoting *People v. Bolin* (1998) 18 Cal.4th 297, 321–322.) As with expert qualifications, we review trial court decisions about the admissibility of evidence for abuse of

discretion. Specifically, we will not disturb a trial court's admissibility ruling " 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].)" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

Morales seeks to challenge the admissibility of Delhauer's testimony on two grounds. First, he argues that Delhauer's testimony regarding the sequence of the crimes was speculative and lacked foundation. Second, he argues for the first time in his reply brief that Delhauer was not qualified to interpret blood spatter and that Delhauer's testimony should have been excluded for that reason as well.

As to the second argument, although Morales raised other objections to Delhauer's testimony in the trial court, he did not object on the basis of Delhauer's qualifications. We have held that failure to specifically object to an expert's qualifications forfeits the objection. (See *People v. Townsel* (2016) 63 Cal.4th 25, 45–46; *People v. Panah* (2005) 35 Cal.4th 395, 478.) Morales has now doubly forfeited the objection by waiting until his reply brief to raise the issue. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.)

But even had Morales not forfeited the claim, the claim would fail under the deferential abuse of discretion standard. Before becoming a crime scene analyst, Delhauer was trained on blood spatter and crime scene reconstruction in the homicide bureau and had examined between 800 and 900 cases. He also trained for six months in the coroner's office, where he examined hundreds of knife wounds. And he had taken a college-level

course in physics for health sciences. At the time of trial, Delhauer had been working as a crime scene analyst for approximately six years. In that role, he took a 40-hour course on blood spatter, during which he learned about blood stains and patterns and conducted around 40 bloodshed experiments. Since then, he had conducted over 200 of his own reconstruction experiments and consulted in over 300 cases. This training and experience is comparable to that of blood spatter experts who have been found qualified to testify in other cases. (See *People v. Hoyos* (2007) 41 Cal.4th 872, 910 [qualified expert had a bachelor's degree in police science and management, and had taken courses in crime scene reconstruction and bloodstain patterns, given lectures on blood evidence, previously testified on blood spatter evidence, conducted blood spatter analysis, and visited homicide scenes], abrogated on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610; *People v. Wallace, supra,* 44 Cal.4th at p. 1062 [qualified expert had six years' experience as a criminalist and a degree in biology, and had trained at a criminalists institute, received 40 hours of education on blood stains, read books and articles on the subject, and analyzed over 20 crime scenes, but had never qualified as an expert on bloodstain interpretation]; *People v. Clark* (1993) 5 Cal.4th 950, 1018–1019 ["witness had: (1) attended lectures and training seminars on the subject of blood dynamics . . . ; (2) read relevant literature; (3) conducted relevant experiments; and (4) visited crime scenes where 'blood-spatter' tests were conducted" (fn. omitted)], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.) It is true that Delhauer's qualifications were in some ways less extensive than comparable experts: Delhauer had no degree in criminal forensics or science, had taken only one college-level science course, and had never

conducted an autopsy. But given his relevant on-the-job training and experience, we cannot say Delhauer " ' " 'clearly lack[ed]' " ' " the necessary qualifications, such that the trial court abused its discretion in finding him qualified to testify as an expert on blood spatter. (*Wallace*, at p. 1063, italics omitted.)[3]

We turn, then, to Morales's primary argument, that Delhauer's testimony as to the sequence of the murders should have been excluded as speculative and lacking in foundation. (See Evid. Code, § 801, subd. (b).) Here again, we cannot say the trial court abused its substantial discretion in allowing the testimony. (See *People v. Goldsmith, supra*, 59 Cal.4th at p. 266 ["[W]e will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner . . . .' "].) Though Delhauer's initial overview of the sequence of events offered little in the way of specific evidence for his conclusions, particularly with respect to the sequence of Ana's and Jasmine's deaths, over the course of the rest of his testimony, he presented evidence that the trial court reasonably believed supported his conclusions. Though Delhauer did not always tie this evidence directly to his sequencing conclusions, we cannot say the

---

[3] We decline Morales's invitation to reach a different conclusion based on a 2009 National Research Council Report suggesting that formal scientific training, as well as experience and experimentation, are important in conducting bloodstain pattern analysis. This report, which was published long after the trial in this case, does not change our conclusion that the trial court acted within its discretion in finding Delhauer qualified to testify as an expert based on his training and experience.

evidence laid no foundation for those conclusions. And, in any event, even if the trial court erred in admitting the testimony, we conclude that any such error was harmless.

Delhauer testified that the murderer first attacked Mike in the office by surprise. To support this conclusion, Delhauer noted Mike was not wearing clothes when he was killed and that he was attacked from behind. Delhauer concluded Maritza was attacked in the office just after Mike was attacked based on blood spatter on the office wall and the location of her earring under the office desk. He testified she then ran to the entryway, where the murderer continued to attack her, based on the consistency between the spatter in the entryway and the numerous wounds she had suffered. The evidence that Maritza exited the office and was attacked continuously in the entryway supports a conclusion that her attack did not occur before Mike was surprised. And given that the evidence showed she was first attacked in the room in which Mike was attacked, it is at least consistent with the evidence to say she was attacked just after Mike.

The evidence Delhauer offered to support the sequence of Ana's and Jasmine's killings is less substantial, but at least some evidence supported his conclusions. He opined Ana had died in the living room based on the consistency between her head wound and a statue found on the living room floor, as well as the small blood stain found in the room. The entryway where Maritza died was connected to the living room, so evidence that Ana died in that room could suggest she was killed just after Maritza was killed nearby. And he concluded Jasmine had died last by being drowned in the bathtub, based on the location of her body, the foam around her mouth, and the lack of evidence of strangulation. The evidence that Jasmine was first assaulted

and then drowned in a different room of the house is consistent with an opinion that she died last, when no adults remained alive to help.

In light of the evidence supporting Delhauer's sequence conclusions, we conclude that the trial court did not abuse its discretion by allowing Delhauer to testify as to this sequence. It was not unreasonable to conclude that Delhauer's opinions had an adequate foundation in the trial evidence and were based on his training and experience in crime scene reconstruction. (Cf. *People v. Robinson* (2005) 37 Cal.4th 592, 631–632 [expert testimony concerning the relative positions of the shooter and the victims had adequate foundation where expert testified that other possible positions would have been awkward]; *People v. Eubanks* (2011) 53 Cal.4th 110, 148 [expert testimony at penalty phase was not speculative because, "[b]ased on his extensive training and experience, as well as on an examination of the premises and a thorough review of the police and medical reports in this case, [the expert] presented testimony regarding bullet trajectories, stippling, and the relative positions of the multiple victims and the shooter that was 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801.)"]; *People v. Nelson*, *supra*, 1 Cal.5th at p. 537 [expert testimony about which victim was shot first was admissible because expert relied on evidence in the record]; *People v. Prince* (2007) 40 Cal.4th 1179, 1223 ["Experts on the subject of crime scene reconstruction, for example, ordinarily may be permitted to give opinion testimony

concerning such matters as the probable location where the crime occurred . . . .”].)[4]

Morales argues that Delhauer's opinions were undermined by law enforcement's failure to type the blood at each location in the home. But contrary to Morales's argument, the blood at each location need not have been typed for Delhauer to draw conclusions about the source of the blood; Delhauer testified that he reached his conclusions by comparing the spatter patterns to each victim's wounds and by analyzing other physical evidence in the home, such as the location of Maritza's earring. Given his qualifications, he was permitted to interpret this evidence as he did. Delhauer's testimony certainly would have been strengthened by blood-typing evidence, but the absence of such evidence did not render his opinions impermissibly speculative and thus inadmissible.

As Morales notes, cross-examination exposed several other weaknesses in Delhauer's testimony, including that he expressly disagreed with some of the coroners; he never viewed the bodies of the victims firsthand; he conducted his testing without using the actual knives in evidence; he did not review any physical evidence; and he potentially misidentified the hookah hose. But these weaknesses go to the weight to be given the evidence, not its admissibility. What we have said in previous cases applies equally here: "Defense counsel was

---

[4] Delhauer did veer into unsupported speculation at various points during his testimony — for example, when he opined that Ana likely came out of the back of the house after hearing noises. But Delhauer's opinions about the locations and sequence of the murders — which is the focus of Morales's claim — did not depend on these embellishments. Any error in admitting these minor embellishments was harmless.

entitled to present his own expert as a defense witness on the issue of [crime scene reconstruction] but did not do so.  Defense counsel also was entitled to challenge the persuasive value of [the expert's] opinion on [crime scene reconstruction] through cross-examination, which he did. . . .  [Q]uestions regarding the validity or the credibility of an expert's knowledge are matters for the jury to decide [citation] but do not provide a basis for excluding the expert's testimony in the first instance and did not do so in this case." (*People v. Nelson*, *supra*, 1 Cal.5th at p. 537; accord, *People v. Rodriguez* (2014) 58 Cal.4th 587, 638.)

In any event, even if the trial court erred in allowing Delhauer to opine on the sequence and locations of the murders, the error was harmless under any possible standard.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

Morales argues that Delhauer's sequence testimony likely influenced the jury's finding of premeditation and deliberation, because it imposed "reason, organization and order" on a "frenzied and chaotic" crime scene.  This argument gives Delhauer's sequencing testimony too much credit.  Delhauer's conclusions about the sequence of the murders formed only a small part of his testimony.  Though Delhauer gave a brief summary of his sequencing conclusions at the beginning of his testimony, his testimony mainly focused on an analysis of where and how each of the victims was killed.  Moreover, as the trial court itself noted, much of this testimony concerned matters already independently established by evidence in the record.  Among other things, the trial evidence showed that Morales used a step stool to sneak into the victims' home and that he attacked Mike in a state of undress, delivering the fatal wound to Mike's neck from behind, and in a manner that resulted in no

defensive wounds. Other evidence also established the manner of killing — the adult victims suffered multiple fatal stab wounds to the neck or chest and Jasmine was drowned. (See *People v. Booker*, *supra*, 51 Cal.4th at pp. 152, 173.) These were the facts that bore most directly on whether Morales acted with premeditation and deliberation. And even absent Delhauer's testimony, it was readily inferable that the victims were likely killed sequentially, so it is unlikely that Delhauer's opinion as to the precise sequence of the murders had any effect on the jury's evaluation of that question. The jury did not need to know the exact sequence of the murders to conclude that the victims were killed one at a time, in a manner suggestive of premeditation and deliberation. Finally, and in any event, Delhauer's testimony was not the only source of sequencing information: Morales himself had told law enforcement officers that the victims were killed in the very same sequence.

In sum, Delhauer's sequencing testimony did not add meaningfully to the picture already before the jury. Any error in admitting the testimony was harmless beyond a reasonable doubt. (See *People v. Gomez* (2018) 6 Cal.5th 243, 296 [finding error admitting expert testimony harmless under both *Chapman* and *Watson*].)[5]

---

[5] At oral argument, defense counsel argued that Delhauer's sequencing testimony prejudiced him at the penalty phase as well as the guilt phase. Specifically, counsel argued that Delhauer's sequencing testimony overshadowed the psychiatric expert testimony presented at the penalty phase, which showed that Morales had a severe learning disability, was not malingering, and tended to react impulsively, instead of methodically. Counsel argued that, absent Delhauer's sequencing testimony, the jury would have more strongly weighed this psychiatric testimony as a "circumstance which

### 3. *Admission of Crime Scene and Autopsy Photographs*

Morales argues that the trial court abused its discretion and violated his constitutional rights to a fair trial and due process when it admitted certain crime scene and autopsy photographs of the victims. We find no error.

In a pretrial hearing, the trial court and the parties discussed the admissibility of color photographs of the victims. The trial judge first noted that the "primary concern has to be probative value versus prejudicial effect." He recognized that the photographs might be gruesome, but he signaled his intent to allow the People significant leeway to introduce photographs given the "incredible complexity of this case." Over the course of the hearing, Morales challenged the admissibility of many photographs, including pictures of the four victims' faces from the autopsy table, which the People intended to use for identification purposes, though defense counsel offered to stipulate to the identities; a series of photographs of Jasmine's body in the bathtub, with and without the large statue on top of her; photographs of Jasmine's vaginal and anal injuries; photographs of Mike's wounds, including severe injuries to his

---

extenuate[d] the gravity of the crime" under Penal Code section 190.3, factor (k).

Again assuming, for the sake of argument, that the trial court erred in allowing Delhauer's sequencing testimony, we are not persuaded that Morales has established penalty-phase prejudice. Delhauer's sequencing conclusions were relatively insignificant in the context of the case, and his testimony largely duplicated other evidence, including Morales's own report to police about the order of the murders. We see no reasonable possibility that exclusion of Delhauer's sequencing testimony would have altered the jury's consideration of whether Morales's psychiatric evidence sufficiently extenuated the gravity of the crime.

neck; and photographs of Ana's injuries. Defense counsel objected to these photographs on a variety of grounds, including cumulativeness and undue gruesomeness, and argued that some of the injury photographs should be introduced in black and white. The trial court ultimately admitted most of these photographs, but also excluded several. The trial court also allowed the photographs to be shown in color.

"Whether the trial court erred in admitting into evidence the challenged photographs of the murder victims depends upon two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in determining that the probative value of each photograph outweighed its prejudicial effect." (*People v. Ramirez* (2006) 39 Cal.4th 398, 453.) We review the trial court's decision to admit the photographs for abuse of discretion. (*People v. Mendez* (2019) 7 Cal.5th 680, 708.) " 'The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect.' " (*People v. Scheid* (1997) 16 Cal.4th 1, 18.)

Morales does not argue that the admitted photographs were irrelevant, nor could he do so successfully. "[T]he photographs were highly relevant to show the manner in which the victims were killed and the severity of their injuries," as well as to "clarif[y] the coroner's testimony." (*People v. Ramirez*, *supra*, 39 Cal.4th at p. 453; accord, *People v. Box* (2000) 23 Cal.4th 1153, 1199.) For example, the autopsy photographs provided detailed views of the victims' injuries, including photographs of the petechiae on Jasmine's hands and feet and the stab and slice wounds to various parts of Mike's, Maritza's, and Ana's bodies. The photographs also served to "illustrate and corroborate the testimony given by [witnesses] regarding the

circumstances of the crime" and discovery of the victims. (*People v. Scheid, supra*, 16 Cal.4th at p. 18.) For example, the photographs of Jasmine in the bathtub and Ana, Mike, and Maritza laying prone in Ana's bedroom displayed the state of the bodies when they were discovered. And finally, the identification photographs were also relevant to identify the victims and provide context to the subsequent photographs of each victim's body. Contrary to Morales's argument, the People were not required to stipulate to the identity of the victims. We have previously rejected the argument that "photographs are irrelevant or inadmissible simply because they duplicate testimony, depict uncontested facts, or trigger an offer to stipulate." (*People v. Stitely* (2005) 35 Cal.4th 514, 545; see also *People v. Pride, supra*, 3 Cal.4th at p. 243 [holding prosecution need not "accept antiseptic stipulations in lieu of photographic evidence"].)

Morales argues instead that the trial court abused its discretion in admitting photographs because they were overly gruesome. We disagree: The trial court did not abuse its discretion when it found that the probative value of each of the admitted photographs outweighed its prejudicial effect, while excluding other photographs for failure to pass this threshold. (See Evid. Code, § 352.)

Many of the photographs are undoubtedly graphic and disturbing, especially the photographs of the injuries Jasmine suffered when assaulted. But " 'victim photographs and other graphic items of evidence in murder cases always are disturbing.' " (*People v. Scheid, supra*, 16 Cal.4th at p. 19.) A trial court may admit photographs of victims even when the photographs are "gruesome" if "the charged offenses were gruesome" and the photographs "[do] no more than accurately

40

portray the shocking nature of the crimes." (*People v. Ramirez, supra*, 39 Cal.4th at p. 454 [finding picture with victim's eyeballs removed not overly graphic]; see, e.g., *People v. Allen* (1986) 42 Cal.3d 1222, 1257–1258 [describing autopsy and crime scene photographs of victims as "not exceptionally gruesome" in part because the victims' bodies were not depicted "in a badly decomposed condition [citation] or after they had been grossly disfigured during autopsy"].) "The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*Ramirez*, at p. 454.) Here, each of the challenged photographs was highly relevant to the jury's consideration of the issues, they were not cumulative, and they did not unnecessarily play on the jury's emotions.

Nor did the trial court abuse its discretion in refusing the defense's request to publish the photographs in black and white instead of color. As the trial court noted at the pretrial hearing, color photographs better depict the "reality" of the scene and the injuries to the victim. The court did not err when it refused to "sanitiz[e] the crime scene by trying to disguise blood" through use of black and white photography. (See *People v. Mathis* (1965) 63 Cal.2d 416, 423 ["It is difficult for a reviewing court to determine if black-and-white would be less inflammatory than color pictures, but considering the subject matter it appears unlikely that the difference would be significant. Since the pictures unquestionably did have evidentiary value and since the trial court thoughtfully weighed the alternatives before ruling, we do not find an abuse of discretion in admitting the photographs into evidence."].)

In sum, the trial court carefully weighed each photograph's probative value against its prejudicial impact, which led it to exclude several photographs and admit others. The trial court did not abuse its discretion in conducting this inquiry. Morales's Evidence Code challenge to the admission of the photographs thus fails, and his constitutional challenge fails for the same reasons. (See, e.g., *People v. Prince, supra,* 40 Cal.4th at p. 1230.)

## B. Penalty Phase Issues

### 1. *Admission of Victim Impact Evidence*

Morales argues that the victim impact testimony of surviving family members was "so voluminous, inflammatory and unduly prejudicial" that it violated his rights to due process and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution, and contravened the Eighth Amendment's mandate that the death penalty be rationally and reliably imposed. Morales then argues that the trial court "compounded" this error by declining to give Morales's proposed instruction on evaluating victim impact evidence — a modified version of a supplement to CALJIC No. 8.85. He is wrong on both fronts.

### a. *Background*

As noted above, at the penalty phase of trial, several of the victims' surviving relatives testified. Raquel Trejo (Maritza's daughter, Mike's stepdaughter, and Jasmine's sister) testified first. Raquel detailed the day she found the house in disarray and learned that her family had been killed; she was in shock and disbelief until she finally realized they were really dead. She then described her relationship with each of the victims.

She loved Jasmine, her "baby girl," and she spent a lot of time with her. Raquel, who had immigrated to the United States a few years earlier, said Jasmine was the only reason Raquel did not return to El Salvador. Jasmine was very happy, smart, and active, and she used to emulate Raquel — a quality Raquel now missed. Raquel discussed several pictures of Jasmine, as well as one of Jasmine's drawings, on which Jasmine had written "I love my family. My mom and dad are the best in the world. And my sister she is the best in the world, to [*sic*]."

Raquel was also very close to her mother, whom she considered a friend. Since moving to the United States, Raquel had enjoyed her time with her mother, whom she described as always happy and very hardworking. She lamented no longer having her mother to confide in. As for Mike, Raquel testified he treated her like she was his daughter and he was always proud of her. Now she no longer had his support or her family around to celebrate with her. And Raquel described Ana as very sweet, someone who always made sure everyone in the family was okay. Raquel then testified that she participated in therapy for two years before enrolling in college, and that recently she had restarted therapy and was taking medicine to help her concentration. She testified she sometimes felt guilty for not being present when the murders occurred. Lastly, she identified Jasmine in a one-minute video clip that showed Jasmine playing with a friend. Raquel indicated that the clip reflected Jasmine's happy demeanor.

The next witness was Kenelly Zeledon, Maritza's sister-in-law. Zeledon remembered the nightmare of finding the victims in the home. She described Mike as a lovely, outgoing, and happy man; Maritza as outgoing, always laughing and joking, and an outstanding salesperson; and Ana as a very caring

person. Jasmine was very dear to Zeledon; Jasmine used to play with Zeledon's son. Since the murders, Zeledon would become anxious at night, always checking the windows and doors to make sure they were locked. She could not go to the bathroom without checking the bathtub, and she constantly was reminded of Jasmine when she dealt with sexual abuse cases through her job as a social worker. She would sometimes cry in her car at stoplights and lose track of time. Because Maritza used to help Zeledon's husband at one of his two stores, after Maritza's death Zeledon's husband had to close one of the stores. For Zeledon, Christmas felt empty without Mike, Maritza, Ana, and Jasmine. She also identified a photo of Mike, Jasmine, and Maritza at an amusement park, and one of Maritza and Jasmine at Zeledon's husband's store.

Miguel Rodriguez, Sr., also testified. He was Mike's father and Ana's son. When he found out about the murders, his life turned upside down. Ana was Rodriguez's best friend; he was her only son, so they were very close. He identified a photo of Ana and himself on Mother's Day. He was also very close to his son Mike, whom he described as his best friend. He got along with Maritza, who took care of the family, and he really loved Jasmine, whom he described as very intelligent. After their deaths, everything changed for Rodriguez; he lost his job, he could no longer sleep, and he was nervous. Rodriguez's wife, Luz Ruiz, testified that she saw the family at least three times per week and had relied on Mike when they needed things. She described Jasmine as a happy child. She confirmed that the murders had significantly affected Rodriguez, saying he was no longer the same man and that he was now very depressed.

Mike's younger sister, Olga Lizzette Ruiz, testified that Mike was her mentor; he was very trusting and friendly, a great

brother and son, and a dedicated father. She and Mike had always talked about throwing a joint birthday party when they both turned 40, but now the party would never happen. She said Mike treated Morales with open arms. She described Maritza as very giving and loving; they drank coffee together almost every morning. Ana had helped raise Olga and Mike; she was very nurturing. At the time she was killed, Ana could no longer take care of herself. Olga described Jasmine as her heart; they spoke every day. Jasmine was intelligent and wanted to become a veterinarian or teacher. When Olga found out about the murders, she was in total disbelief. She was asked to identify the bodies at the morgue, and it was the most horrific experience of her life. She was still waiting for someone to tell her the murders were a nightmare, but she knew the victims would never return and she missed them. She had tried therapy because she was very angry. For her, the worst part was not knowing how much her family had suffered or why someone would torture a young girl or kill an 81-year-old woman. She felt helpless. She identified a photo of Mike and Jasmine with their dog, as well as the family's funeral invitation, which showed a few pictures of the family but did not have much text.

### b. *Discussion*

Morales argues that the victim impact evidence in this case was so voluminous and inflammatory that it invited the jury to abandon its role as a neutral arbiter and instead to impose a penalty of death based on its "passionate, irrational, and purely subjective response to the sorrow of the surviving Ruiz family members." Morales's argument does not focus on any specific testimony or pieces of evidence; his argument

instead is that admission of the victim impact evidence, taken as a whole, violated his constitutional rights.

Victim impact evidence is generally relevant and admissible as a circumstance of the crime under Penal Code section 190.3, factor (a), "so long as it is not 'so unduly prejudicial' that it renders the trial 'fundamentally unfair.'" (*People v. Russell* (2010) 50 Cal.4th 1228, 1264, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825; accord, *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056.) This court has consistently upheld as constitutional "[a]dmission of testimony presented by a few close friends or relatives of each victim, as well as images of the victim while he or she was alive." (*Russell*, at p. 1265.) We have also upheld the introduction of videotapes, though we have cautioned trial courts not to admit videotapes that can overly rouse the jurors' emotions. (See *People v. Bell* (2019) 7 Cal.5th 70, 127–128.)

The victim impact evidence in this case falls within constitutional bounds. The five victim impact witnesses testified "'about their relationship with' the victims, 'how they learned about' the victims' deaths, and how the murders 'affected their lives.'" (*People v. Mendez*, *supra*, 7 Cal.5th at p. 712.) Their testimony "'concerned the kinds of loss that loved ones commonly express in capital cases,'" such as "recounting basic facts about [the victims]," speaking "of their love of [the victims], special moments they shared with [them], their feelings upon learning of [their] death[s] . . . and how the manner in which [the victims] died affected them and various family members." (*People v. Jones* (2012) 54 Cal.4th 1, 70; see also *People v. Dykes* (2009) 46 Cal.4th 731, 783 [finding permissible testimony "concerning the victim's character"].) And "[t]he details of that testimony were not materially more

emotionally inflammatory than that approved by our precedents." (*Mendez*, at p. 712; see *Dykes*, at p. 782.)

Nor was the testimony excessive. The prosecution called five witnesses to testify about four victims. (Cf. *People v. Mendez*, *supra*, 7 Cal.5th at p. 712 ["[P]ermitting victim impact testimony from six witnesses regarding two victims — that is, three per victim — is comparable to what we have permitted in other cases."].) And each witness's testimony was relatively brief, with the testimony of all five witnesses spanning just 52 total pages of transcript. (See *People v. Dykes*, *supra*, 46 Cal.4th at p. 782 [testimony not "too extensive" where it spanned 32 pages of transcript for a single victim].)

Admission of the eight photographs depicting the four victims likewise was constitutional. A set of eight photographs depicting everyday events in the lives of the victims is not excessive. (See *People v. Mendez*, *supra*, 7 Cal.5th at p. 712 ["Admitting some 13 photos of [the first victim] and fewer of [the second victim] likewise was not excessive under our cases."]; *People v. Jones*, *supra*, 54 Cal.4th at pp. 69–70 [32 photographs for single victim not improper].) The photographs here "of ordinary family events were factual, relevant, and not unduly emotional or sentimental." (*Jones*, at p. 71.) The same is true of Jasmine's drawing, in which she said she loved her family and her sister. The drawing provided relevant information about the relationship between Jasmine and Raquel and did not invite the jury to rule based on emotion. (Cf. *Mendez*, at pp. 713–714 [finding victim's poem bemoaning gang violence admissible].) We have also previously allowed trial courts to admit pictures of the victims as children where the victims were still young when they were killed. (See *id.*, at p. 712, fn. 3.) Here, the

photographs of Jasmine showed her close in age to her age at death and were not improper.

Finally, we see no error in permitting the prosecution to introduce the minute-long video clip of Jasmine playing with a friend. We have previously found relatively short home videos to be admissible victim impact evidence. In *People v. Dykes*, *supra*, 46 Cal.4th 731, for example, we upheld the admissibility of an eight-minute videotape (without audio) that showed the child victim preparing for and taking a trip to Disneyland with his family. (*Id.* at pp. 784–785.) We found that "the material, which merely depicts ordinary activities and interactions between [the victim] and his family, was relevant to humanize the victim and provide some sense of the loss suffered by his family and society." (*Id.* at p. 785.) And we noted that "[t]he videotape [was] an awkwardly shot 'home movie.' " (*Ibid.*) It was not "a memorial, tribute, or eulogy"; it did not "contain staged or contrived elements, music, visual techniques designed to generate emotion, or background narration" or "convey any sense of outrage or call for vengeance or sympathy," and it "last[ed] only eight minutes and [was] entirely devoid of drama" — it was merely "factual" and depicted "real events." (*Ibid.*) For these reasons, and because the evidence "supplemented but did not duplicate" the witness's testimony, we held it admissible. (*Ibid.*; see also *People v. Bell*, *supra*, 7 Cal.5th at p. 128 [upholding admission of four-minute wedding video that resembled a home movie and was not enhanced in any way because it depicted "a real event in the victim's life, shortly before his murder"]; *People v. Mendez*, *supra*, 7 Cal.5th at p. 713 [upholding admission of portions of home video showing young victim's sixth grade graduation].) Like the video in *People v. Dykes*, the video of Jasmine was a

short home movie that depicted real life events. It was not enhanced in any way, and it did not invite vengeance or undue sympathy. It simply "humanize[d]" Jasmine in a way that supplemented the testimony of the witnesses. (*Dykes*, at p. 785.) In sum, the admission of the victim impact evidence did not violate Morales's constitutional rights.

Morales also argues the trial court erred by failing to give his proposed victim impact instruction. In particular, after the conclusion of penalty phase testimony, the defense requested the trial court instruct the jury with a modified version of a supplemental instruction to CALJIC No. 8.85. The unmodified instruction states: "Evidence has been introduced for the purpose of showing the specific harm caused by the defendant's crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy." Defense counsel requested the court give this instruction but delete the final sentence. The court declined, explaining the final sentence was necessary to inform the jury that it could consider evidence on emotional subjects in making its final decision. As a result, defense counsel withdrew the proposal, and the instruction was not given. The trial court did, however, give CALJIC No. 8.85, which lists the factors the jury must consider in determining whether it should impose a penalty of death, and CALJIC No. 8.84.1, which tells the jury, in relevant part: "You must neither be influenced by bias nor

prejudice against the defendant, nor swayed by public opinion or public feelings.  Both the People and the defendant have a right to expect . . . that you will consider all of the evidence, follow the law, exercise your discretion conscientiously, and reach a just verdict."

Morales argues it was error to refuse to give the modified version of the supplemental instruction to CALJIC No. 8.85.  We have previously rejected this same argument about this exact modified instruction.  (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 506–507, fn. 22.)  We have also repeatedly rejected similar arguments concerning proposed instructions similar to the full, unmodified supplemental instruction proposed in this case.  (*People v. Thomas* (2012) 53 Cal.4th 771, 825 [collecting cases].)  We have explained that the instruction is duplicative of CALJIC No. 8.84.1 and thus " 'would not have provided the jury with any information it had not otherwise learned.' " (*Thomas*, at p. 825, quoting *People v. Ochoa* (2001) 26 Cal.4th 398, 455.)  Further, we have noted the instruction is both confusing and "misleading to the extent it indicates that emotions may play no part in a juror's decision to opt for the death penalty." (*People v. Zamudio* (2008) 43 Cal.4th 327, 368, citing *People v. Pollock* (2004) 32 Cal.4th 1153, 1195; see *Zamudio*, at pp. 368–369; *People v. Harris* (2005) 37 Cal.4th 310, 359 [finding proposed instruction "confusing" and "unclear as to whose emotional reaction it directed the jurors to consider with caution — that of the victim's family or the jurors' own"].)  As we have previously said, "[a]lthough jurors must never be influenced by passion or prejudice, at the penalty phase, they 'may properly consider in aggravation, as a circumstance of the crime, the impact of a capital defendant's crimes on the victim's family, and in so doing [they] may exercise sympathy for the

defendant's murder victims and . . . their bereaved family members.' " (*Zamudio*, at pp. 368–369, quoting *Pollock*, at p. 1195, italics omitted, second brackets in original.)

This reasoning applies with equal if not greater force to Morales's request to instruct the jury with a modified version of the instruction that omitted its last sentence. Deleting the instruction's final sentence removes its only suggestion that jurors can consider emotions in reaching their decision. Without that sentence, the instruction becomes even more misleading to the extent it more strongly suggests that "emotions may play no part in a juror's decision to opt for the death penalty." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 368.) Because the proposed instruction would have been both duplicative and misleading, the trial court properly refused to give it.

### 2. *Instruction with CALJIC No. 8.88*

The court instructed the jury with CALJIC No. 8.88, subject to minor modifications requested by the defense and not at issue here. That instruction guides jurors in using aggravating and mitigating circumstances to arrive at a verdict.[6] Morales objects to several aspects of the instruction.

---

[6] In relevant part, the jury was instructed with CALJIC No. 8.88 as follows:

"It is now your duty to determine which of the two penalties, death or imprisonment in the state prison for life without possibility of parole, shall be imposed on . . . defendant.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

As Morales acknowledges, we have previously rejected each of the arguments he now raises. He offers no persuasive reason for us to reconsider our prior cases.

First, Morales takes issue with the portion of the instruction that provides, "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (CALJIC No. 8.88.) He argues that this direction would permit a death sentence even if the jury determined that mitigating circumstances outweighed the aggravating circumstances. But as we have previously explained, the instruction, taken as a whole, "clearly stated that the death penalty could be imposed only if the jury found that the aggravating circumstances outweighed mitigating. There was no need to additionally advise the jury of the converse (i.e., that if mitigating circumstances outweighed aggravating, then life

---

". . . .

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

without parole was the appropriate penalty).” (*People v. Duncan* (1991) 53 Cal.3d 955, 978; see *People v. Landry* (2016) 2 Cal.5th 52, 122; *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 457; *People v. Linton* (2013) 56 Cal.4th 1146, 1211; *People v. Whalen* (2013) 56 Cal.4th 1, 89.)

Second, Morales argues the instruction is incomplete because it fails to advise the jurors that they could opt for a life sentence even in the absence of mitigating evidence. (See *People v. Duncan*, *supra*, 53 Cal.3d at p. 979 [“The jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death.”].) We have repeatedly rejected this claim, explaining the instruction already adequately conveys the point. (E.g., *People v. Anderson* (2018) 5 Cal.5th 372, 424–425; *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 457; *People v. Linton*, *supra*, 56 Cal.4th at p. 1211.)

Third, Morales argues that the use of “so substantial” to describe the necessary relationship between aggravation and mitigation is unconstitutionally vague. This language did not render the instruction vague. (*People v. Landry*, *supra*, 2 Cal.5th at p. 123; *People v. Thompson* (2016) 1 Cal.5th 1043, 1128; *People v. Linton*, *supra*, 56 Cal.4th at p. 1211; *People v. Whalen*, *supra*, 56 Cal.4th at p. 89.)

Finally, Morales complains that the jury was not told to determine whether death was the appropriate punishment, but rather to decide whether death was “warrant[ed].” This is a distinction without a difference. The entirety of the instruction left no doubt that the jury “could return a death verdict only if aggravating circumstances predominated and death is the appropriate verdict.” (*People v. Breaux* (1991) 1 Cal.4th 281,

316.)  The use of "warrants" in place of "appropriate" does not undermine this message.  (*People v. Landry, supra*, 2 Cal.5th at p. 122; *People v. Linton, supra*, 56 Cal.4th at p. 1211; *Breaux*, at p. 316.)  To the contrary, " '[b]y advising that a death verdict should be returned only if aggravation is "so substantial in comparison with" mitigation that death is "warranted," the instruction clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty.' "  (*People v. Perry* (2006) 38 Cal.4th 302, 320, quoting *People v. Arias* (1996) 13 Cal.4th 92, 171.)

### 3.  *Challenges to California's Death Penalty Scheme*

Morales raises a series of challenges to the constitutionality of California's death penalty.  We have considered and rejected each before.  Because Morales offers no compelling arguments in favor of reconsidering these rulings, we again reject these arguments.

California's special circumstances (see Pen. Code, § 190.2) supply rational and objective criteria that adequately narrow the class of murderers eligible for the death penalty.  (*People v. Brooks* (2017) 3 Cal.5th 1, 114–115; *People v. Delgado* (2017) 2 Cal.5th 544, 591; *People v. Winbush* (2017) 2 Cal.5th 402, 488.)

Penal Code section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding the appropriate punishment, does not license the arbitrary and capricious imposition of the death penalty.  (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976; *People v. Henriquez* (2017) 4 Cal.5th 1, 45; *People v. Winbush, supra*, 2 Cal.5th at p. 489; *People v. Simon* (2016) 1 Cal.5th 98, 149.)

The death penalty statute is not unconstitutional for not requiring "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or factor (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235.) Nor does the federal Constitution require the jury to agree unanimously on any particular aggravating factor. (*People v. Henriquez, supra*, 4 Cal.5th at p. 45; *People v. Winbush, supra*, 2 Cal.5th at p. 489.) *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and their progeny do not require reconsideration of these conclusions. (*Henriquez*, at p. 45; *Winbush*, at p. 489; *People v. Delgado, supra*, 2 Cal.5th at p. 591; *People v. Simon, supra*, 1 Cal.5th at p. 149.)

The failure to impose a specific burden of proof on the ultimate question of life or death is not unconstitutional. (*People v. Henriquez, supra*, 4 Cal.5th at p. 45; *People v. Parker* (2017) 2 Cal.5th 1184, 1232; *People v. Winbush, supra*, 2 Cal.5th at pp. 489–490.)

The federal Constitution does not require that the penalty jury issue written findings. (*People v. Henriquez, supra*, 4 Cal.5th at p. 46; *People v. Winbush, supra*, 2 Cal.5th at p. 490; *People v. Thompson, supra*, 1 Cal.5th at p. 1130.) Nor does it require intercase proportionality review. (*Henriquez*, at p. 46; *Winbush*, at p. 490; *Thompson*, at p. 1130; *People v. Simon, supra*, 1 Cal.5th at p. 149.)

The federal Constitution does not prohibit the use of prior unadjudicated criminal activity as an aggravating factor, nor does it require that such activity be found unanimously beyond

a reasonable doubt. (*People v. Brooks*, *supra*, 3 Cal.5th at p. 115; *People v. Thompson*, *supra*, 1 Cal.5th at p. 1130; *People v. Simon*, *supra*, 1 Cal.5th at p. 150.) Neither *Apprendi v. New Jersey*, *supra*, 530 U.S. 466, nor *Ring v. Arizona*, *supra*, 536 U.S. 584, requires reappraisal of that conclusion. (*People v. Jones* (2017) 3 Cal.5th 583, 619.)

The use of the adjectives "extreme" and "substantial" in Penal Code section 190.3's list of mitigating factors does not prevent the jury from giving full consideration to a defendant's mitigating evidence. (*People v. Brooks*, *supra*, 3 Cal.5th at p. 115; *People v. Landry*, *supra*, 2 Cal.5th at p. 122; *People v. Simon*, *supra*, 1 Cal.5th at p. 150.)

The jury need not be instructed that potential mitigating factors may be considered only as mitigation and their absence may not be treated as a factor in aggravation. (*People v. Winbush*, *supra*, 2 Cal.5th at p. 490; *People v. Contreras* (2013) 58 Cal.4th 123, 173.)

The equal protection clause does not require California to include in its capital sentencing scheme every procedural protection provided to noncapital defendants. The two groups are not similarly situated. (*People v. Henriquez*, *supra*, 4 Cal.5th at p. 45; *People v. Winbush*, *supra*, 2 Cal.5th at p. 490; *People v. Parker*, *supra*, 2 Cal.5th at p. 1234; *People v. Williams* (2013) 58 Cal.4th 197, 295.)

Morales contends California's regular use of capital punishment violates international norms of human decency and thus the Eighth and Fourteenth Amendments to the United States Constitution. But " 'California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special

circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to "regular punishment" for felonies. (E.g., Cal. Const., art. VI, § 11; [Pen. Code,] §§ 190.1– 190.9, 1239, subd. (b).)' " (*People v. Trinh* (2014) 59 Cal.4th 216, 255, quoting *People v. Demetrulias* (2006) 39 Cal.4th 1, 43–44; see *People v. Winbush*, *supra*, 2 Cal.5th at p. 490.)

Finally, Morales argues these individual defects must be considered for their cumulative impact, rather than in isolation. He has identified no defects. Moreover, even when considered in combination, the aspects of California's scheme Morales highlights do not persuade us that California imposes capital punishment in a manner that violates the United States Constitution.

### III. Disposition

We affirm the judgment.

**KRUGER, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Morales

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S136800
**Date Filed:**  August 10, 2020

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Michael A. Cowell


_____

**Counsel:**

Diane E. Berley, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala Harris and Xavier Becerra, Attorneys General, Lance E. Winters, Assistant Attorney General, Keith H. Borjon, Joseph P. Lee and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Diane E. Berley
Attorney at Law
1440 Beaumont Avenue, Sutie A2-307
Beaumont, CA 92223
(818) 943-6457

Nima Razfar
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6188