Filed 10/22/20  P. v. Kambouris CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072468 |
| v. | (Super.Ct.No. RIF1703402) |
| JAMES TYLER KAMBOURIS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Patrick F. Magers, Judge. (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part, reversed in part, and remanded with directions.

Bruce L. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Michael Pulos and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant James Tyler Kambouris and his girlfriend had a falling out. He went to her house; when she would not let him in, he broke a window and came in anyway. A male relative of the girlfriend blocked defendant's way. Defendant threatened to kill him, then punched him. But the relative — unbeknownst, it seems, to defendant — was trained in Brazilian jiu jitsu. He got defendant in a chokehold and held onto him until the police arrived. As the police were escorting defendant away, he told the relative he was going to come back with a knife.

In a jury trial, defendant was found guilty of first degree burglary (§ 459),[1] assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)), and two counts of making a criminal threat (§ 422). He admitted one prior prison term enhancement. (§ 667.5, subd. (b).) He was sentenced to a total of five years in prison, along with the usual fines, fees, and ancillary orders.

Defendant contends that:

1. The trial court erred by admitting a recording of defendant cursing and making anti-Semitic statements after he was arrested.

2. The evidence does not support two counts of making a criminal threat, because the victim was in only one period of sustained fear.

3. Under recently enacted legislation, defendant's prior prison term enhancement must be stricken.

---

[1] This and all further statutory citations are to the Penal Code, unless otherwise indicated.

We agree that the trial court erred by admitting the recording, but we conclude that, on this record, the error was harmless. We will hold that there was sufficient evidence of two counts of making a criminal threat. Finally, the People concede that the prior prison term enhancement must be stricken, and we agree. Hence, we will remand for resentencing.

I

STATEMENT OF FACTS

Desiree Cupples[2] was defendant's girlfriend. She lived with her mother; her sister, Cassandra Martinez; her sister's boyfriend, Jorge Gonzalez, and Cassandra and Jorge's three-year-old son.

On the night of September 1-2, 2017, around midnight, Desiree was at a motel room with defendant when they got into an argument. It was about the fact that Desiree had cheated on defendant.

Desiree left, but by the time she got home, she realized that she had left her purse in the motel room. She went back to get it. At her request, Jorge accompanied her. She knocked on the door, but defendant would not open it, so she called the police. They responded, but they told Desiree there was nothing they could do because it was defendant's room. Desiree and Jorge left.

---

[2] For readability and to maintain consistency with the transcript, we will refer to her and to all other participants by their first names.

3

Early the next morning, Desiree went back to the motel room, this time accompanied by one Adrian Ramirez (the man with whom she had cheated on defendant). She knocked on the door. This time, defendant opened it and gave her her purse; they did not speak.

Around 6:00 p.m., defendant phoned Desiree. He said he wanted to talk to her; she said she did not want to talk to him. "[I]t was a short, brief, pleasant conversation."

Around 11:30 p.m., defendant "bang[ed]" on Desiree's front door. He said, "I want to talk to you." She replied, "I'm not going to talk to you when you're like this. Go away and we'll talk later."

Defendant continued to yell, using profanity, and to bang on the door and on the windows. He was saying, "Let me in, Desiree, you fucking bitch. You whore." She could tell he had been drinking. Jorge called 911. Meanwhile, Desiree, her sister, and her sister's child all went into the sister's bedroom and locked the door.

Through a window, defendant could see that Jorge was on the phone. He yelled, "Jorge, you bitch. You're calling the cops. Let's handle this outside." Then he broke the window of Desiree's bedroom and climbed inside. He sustained cuts to his arms and hands.

Defendant was "cursing up a storm." According to Jorge, he said, "I'm going to fucking kill you." According to Desiree, he said, "I will fucking kick your ass, Jorge." He "charged" at Jorge and punched him in the mouth, giving him a cut lip.

4

Jorge threw defendant to the floor, got on top of him, and got him in a chokehold. Defendant said he could not breathe, adding, "I'm tapping out. Let go." Jorge responded, "The hell I'm letting go. I'm not letting go until the police get here." Defendant was close to passing out (or did pass out); he soiled himself.

Jorge testified that he was not afraid; "[i]t was just adrenaline." Only "after[] everything happened" did he become "fearful[,] because [he] thought to [him]self, what if he would have had a weapon."

Jorge told police, however, that, when defendant threatened to kill him, he was afraid for his family. At trial, when asked if he "had concerns" for his wife and child at this point, he answered: "I was fearful because if I was not able to subdue him, then I knew immediately, he would have gone towards the room and towards them."

After defendant had been in the house for five to ten minutes, the police arrived. Jorge released defendant and the police handcuffed him.

The police took Jorge, Cassandra, and Desiree outside. As defendant was being escorted down the driveway and out to a patrol car, he continued to call them profane names. He told Jorge, "Better watch your back. Next time, I'm going to have a fucking knife." Jorge was afraid, for himself, for Cassandra, and for their son: "I said to myself, what if he would have a weapon. If he were to get bailed out today, would he return tomorrow night[?]" He was so concerned that he asked an officer, "When is he going to get out? What do I have to do to protect myself?"

The police took defendant to a hospital. A recording of defendant at the hospital was played for the jury. In it, he refused care. He was belligerent and uncooperative. He used the F-word in nearly every sentence, and he called someone a "[f]uckin' Jew" and a "[f]uckin' kike."

## II

## ADMISSION OF THE RECORDING OF DEFENDANT AT THE HOSPITAL

Defendant contends that the trial court erred by admitting the recording of him at the hospital, because it was irrelevant and unduly prejudicial.

Defense counsel preserved this contention by raising a timely objection on these same grounds below. The prosecutor argued that the recording was relevant to rebut a voluntary intoxication defense. The trial court overruled the objection. Defense counsel did request, and the trial court did give, a voluntary intoxication instruction.

"Evidence Code section 352 gives the trial court discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . .' A trial court's exercise of discretion under section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner. [Citations.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

Burglary (count 1) and making a criminal threat (counts 2 and 3) each require a certain specific intent. (§§ 422, subd. (a) [specific intent that statement be taken as a threat], 459 [intent to commit a felony].) Accordingly, evidence of voluntary intoxication

6

was relevant and admissible to the extent that it tended to show that defendant did not form the requisite specific intent. (§ 29.4, subd. (b).) Conversely, evidence that defendant *could* form the requisite specific intent would be admissible to disprove his voluntary intoxication defense. The People reiterate their argument at trial that the recording was admissible for this purpose.

The problem with the People's position is that the recording did not particularly show that defendant was able to form a specific intent.

Admittedly, he did understand that he could refuse care and that he was doing so: "I don't agree to consent of the fuckin' hospital. I don't want nobody helping me."

However, that is about the sum total of his lucidity. The recording showed that defendant was extremely intoxicated — inferably so much so as to defeat the ability to form a specific criminal intent. He had a long tantrum, like a two-year-old, only with more cursing. His very refusal of medical care showed some irrationality. Even though hospital personnel said he needed an x-ray because he might have pieces of glass in his wounds, he insisted, "Get some fuckin' super glue and fuckin' glue it together. It's fine."

When hospital personnel said, "We wanna make sure you don't get an infection," he replied, "Fuck you, dude. The jail will take care of that." However, he also said, "I need help right now. (Unintelligible) fuckin' tetanus shot. . . . Now I gotta go to another hospital. (Unintelligible). I just got a tetanus shot." This seems like confusion.

He again seemed confused when he said: "You guys are real fuckin' nice guys, huh? (Unintelligible) could have gotten me some (unintelligible) fuckin' girls

7

(unintelligible). It's fuckin' cold in there but you know what? Fuck him. And, uh, you should say fuck me for bringing him to you like that." Later, he said, "I need a drink to show the doctor," whatever that may mean. He gave a false identification card, but then immediately admitted that it was false: "Dude, I gave y'all a bunch of false shit." "Ain't even my ID." (Capitalization altered.)

In contrast to its lack of probative value, the recording was definitely prejudicial. Defendant was not just uncooperative and profane, but mean; he called the people around him, including medical personnel who were trying to help him, "stupid," "asshole," "jerkoffs," and "[p]rick." And, of course, he made anti-Semitic statements.

To the extent that the recording was relevant at all, it could easily have been redacted to reduce its prejudicial effect. At a minimum, the anti-Semitic statements could have been redacted, as they had no relevance whatsoever. Admittedly, defense counsel did not request any redactions; hence, he forfeited the argument that the trial court erred by failing to redact the recording. (*People v. Champion* (1995) 9 Cal.4th 879, 914.) But the trial court could still have redacted the recording on its own motion, or else it could have excluded it as a whole. What it could not properly do is *admit* it as a whole. By doing so, it abused its discretion.

We turn, then, to whether the error was prejudicial.

Defendant contends that the admission of the recording was so prejudicial that it violated due process. "A trial court's determinations under Evidence Code section 352 do not ordinarily implicate the federal Constitution, and are reviewed under the

8

'reasonable probability' standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . ." (*People v. Gonzales* (2011) 51 Cal.4th 894, 924.)  Under that standard, an error is prejudicial "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson*, *supra*, at p. 836.)  If an error is not prejudicial under this standard, then a fortiori it did not render the trial so fundamentally unfair as to violate due process.  (See generally *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 244 ["'the due process clause protects defendants against unduly prejudicial evidence that would render a trial fundamentally unfair . . . .'"].)

As already discussed, the recording actually tended to support defendant's voluntary intoxication defense.  In closing argument, the prosecutor did not even mention the recording (which is consistent with our view that it was not particularly probative).  Defense counsel, on the other hand, argued:  "Look, Mr. Kambouris was pretty drunk.  You could hear it on the tape.  And he said a lot of nasty, vulgar, crude — and I apologize . . . to you folks, that you were subjected to that.  But that is what drunks do."  He also argued that defendant was so drunk that he lacked the specific intents that the charges required.

There was ample evidence, even without the recording, that defendant was prone to name-calling and profanity.  He demanded, "Open the fucking door."  He called Jorge a "bitch" and a "motherfucker"; he called Desiree a "fucking bitch" and a "whore."  "He

9

wouldn't stop cussing." Even as he was taken away in handcuffs, he was still calling Jorge and Desiree profane names. Thus, the profanity in the recording, while prejudicial, was not additionally so.

The most potentially prejudicial portion of the recording consisted of the two anti-Semitic statements. But we see no reasonable likelihood of any actual prejudice. The statements were made one right after another, in the midst of a lengthy rant. The jury was preinstructed, "[Y]ou must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." (CALCRIM No. 200.)

In addition, the jurors deliberated for most of an afternoon and most of the following morning. They sent out two questions. First, they asked what evidence they could look to in determining defendant's intent in breaking into the house; they even commented, "It seems like his only intent was really to get to his girlfriend." Second, they asked for a readback of the testimony "about the time between breaking the window and hitting Jorge." Obviously, the recording did not stampede them into a guilty verdict. Rather, they carefully considered the evidence.

We therefore conclude that the error was harmless.

III

NUMBER OF COUNTS OF MAKING A CRIMINAL THREAT

Defendant contends that the evidence supports only one count of making a criminal threat.

10

In closing argument, the prosecutor indicated that the first count was based on defendant's threat(s) in the bedroom, "I will fucking kick your ass, Jorge" and/or "I'm going to fucking kill you"; the second count was based on his threat in the driveway, "Better watch your back. Next time, I'm going to have a fucking knife."

The crime is defined, as relevant here, as "willfully threaten[ing] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat"; the threat must "cause[] that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . ." (§ 422, subd. (a).)

This has been construed as "prohibit[ing] multiple convictions based on multiple threats toward a single victim during a single encounter. The appropriate unit of prosecution is indicated by section 422's requirement that the victim 'be *in sustained fear* for his or her own safety or for his or her immediate family's safety. . . .' [Citations.] Sustained fear occurs over 'a period of time "that extends beyond what is momentary, fleeting, or transitory."' [Citation.] . . . A violation of section 422 is not complete upon the issuance of a threat; it depends on the recipient of the threat suffering 'sustained fear' as a result of the communication. It is not appropriate to convict a defendant of multiple counts under section 422 based on multiple threatening communications uttered to a single victim during a brief, uninterrupted encounter." (*People v. Wilson* (2015) 234 Cal.App.4th 193, 201.) "It does not matter whether [the victim]'s primary fear was for himself or members of his family at various times." (*Id*. at p. 202.)

11

Defendant's contention is essentially a claim that there is insufficient evidence of two separate instances of the crime. Defendant disagrees, citing *Wilson*, in which the court stated, "Our review is de novo . . . . [Citations.]" (*People v. Wilson*, *supra*, 234 Cal.App.4th at p. 198.) At that point, however, it was considering the definition of the unit of prosecution under section 422 — an issue of statutory interpretation, which is indeed reviewed de novo. It appears that the facts were not in dispute (or if they were, the court accepted the version most favorable to the prosecution). (See *id*. at pp. 196-197.) Here, by contrast, we accept *Wilson*'s definition, and we proceed to apply it to facts that could have more than one interpretation.

Accordingly, we apply the well-worn substantial evidence standard of review. "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court ""'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'"" [Citation.]' [Citation.]" (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

Defendant points to Jorge's testimony that, when defendant threatened him in the bedroom, he was not afraid; he became afraid only "after[] everything happened," "because [he] thought to [him]self, what if [defendant] would have had a weapon." Jorge also testified that, when defendant threatened him in the driveway, he was afraid, because he thought, "[W]hat if [defendant] would have a weapon[?]" Defendant concludes that this showed only one period of sustained fear.

This overlooks the fact that Jorge told police that, when defendant threatened him in the bedroom, he was afraid for his family. At trial, he testified that he was afraid for his wife and child. We understand Jorge's testimony, taken as a whole, to mean that at this point, he was not afraid for himself, but he *was* afraid for Cassandra and their son.

Jorge's fear for his family would naturally persist, even though he had defendant in a chokehold, because he could not risk letting defendant go. However, it would naturally abate once the police arrived and handcuffed defendant. This was a period of some five to ten minutes. A jury could therefore find that Jorge suffered sustained fear. (See *People v. Culbert* (2013) 218 Cal.App.4th 184, 190-191 ["sustained fear" can refer to fear lasting as little as one minute].) On that view, when defendant threatened to come back with a knife, Jorge was placed in fear a second and separate time.

We therefore conclude that defendant could properly be convicted on two counts of making a criminal threat.

13

IV

THE EFFECT OF SENATE BILL NO. 136

ON THE PRIOR PRISON TERM ENHANCEMENT

Defendant contends that, under recently enacted legislation, his prior prison term enhancement must be stricken. The People concede the point.

We agree. Senate Bill No. 136 (2019-2020 Reg. Sess.), effective January 1, 2020, amended section 667.5, subdivision (b) so as to eliminate all prior prison term enhancements, unless the prior prison term was for a sexually violent felony. Defendant's prior prison term was not. As an ameliorative statute, Senate Bill No. 136 applies to all defendants whose conviction is not yet final. (*People v. Cruz* (2020) 46 Cal.App.5th 715, 739; see generally *In re Estrada* (1965) 63 Cal.2d 740, 744-748.)

Both sides agree that the appropriate appellate remedy is to remand for resentencing. We will do so.

V

DISPOSITION

The judgment with respect to the conviction is affirmed. The judgment with respect to the sentence is reversed, and the prior prison term enhancement is stricken; on

14

remand, the trial court must resentence defendant accordingly.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

SLOUGH
J.