Filed 7/15/24  P. v. Lopez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081032 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS250943) |
| MARIO ARMANDO LOPEZ, | |
| Defendant and ApOrpellant. | |

APPEAL from an order of the Superior Court of San Diego County, Francis Devany, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski, Lynne G. McGinnis and Minh U. Le, Deputy Attorneys General for Plaintiff and Respondent.

Mario Lopez and four other inmates of the County jail beat and tortured to death an elderly inmate who was a convicted child molester. A jury convicted Lopez of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and torture (§ 206; count 3). The jury acquitted him of conspiracy to commit murder (§§ 182, subd. (a)(1), 187; count 2). Lopez is serving a sentence of 28 years to life in prison for the first degree murder conviction; the sentence for torture is stayed. We affirmed the judgment in an unpublished opinion on Lopez's direct appeal, *People v. Lopez* (Jan. 28, 2016, D065801).

Lopez filed a petition for resentencing in 2019 under former section 1170.95.[2] Lopez claimed he was eligible for resentencing because he was convicted based on either a felony murder theory or a theory of natural and probable consequences for which he could no longer be convicted under current law. The trial court summarily denied the petition after determining the record of conviction established Lopez was the actual killer. In an unpublished opinion, *People v. Lopez* (Aug. 6, 2021, D078176), we determined the trial court erred in making a factual finding that Lopez was the actual killer without issuing an order to show cause and setting an evidentiary hearing as required by statute. We remanded the case for such a hearing.

At the evidentiary hearing on remand, the court considered the evidence from the underlying record of conviction as well as further briefing and argument. The court again denied Lopez's petition for resentencing after

---

[1] All further statutory references are to the Penal Code.

[2] Former section 1170.95 was renumbered without significant change to section 1172.6. (Stats 2022 ch 58 § 10 (AB 200), effective June 30, 2022.) For clarity we refer to section 1172.6.

2

independently finding the evidence proved beyond a reasonable doubt that Lopez is guilty of first degree murder and is ineligible for resentencing as the actual killer of the victim. The court also found that Lopez was a major participant in the fatal assault who acted with reckless indifference to the victim's life and that Lopez, with an intent to kill, aided and abetted the other inmates in assaulting the victim.

In this appeal, Lopez contends we should reverse the order denying his petition because there was not substantial evidence to support the trial court's findings that Lopez acted with intent to kill or that he was the actual killer. We disagree and affirm the order.

STATEMENT OF FACTS

We adopt the factual overview from our prior opinions:

"In July 2011, Lopez was a prisoner being detained at the George Bailey Detention Center and was known in the prison by the moniker 'Evil.' Prison personnel had made Lopez the 'captain' of the medical unit where he was being held, and inmates in the unit followed his orders without question.

"[R.] Hartsaw was also a prisoner at Bailey, and, on the evening July 17, 2011, Hartsaw asked a correctional officer to be moved from his then current unit to another unit. Later that evening, a correctional officer placed Hartsaw in the medical unit and asked Lopez to help Hartsaw find a bunk. Lopez agreed. At some point, Lopez learned that Hartsaw had been in protective custody and that he was a convicted child molester.

"A few hours after Hartsaw was placed in the unit, Lopez and a number of other inmates lured Hartsaw to an isolated area of the unit, and, shortly after guards had passed through the area, Lopez and the other inmates spent 30 minutes punching, kicking, and stomping Hartsaw to death. Toward the end of the assault, Lopez circled Hartsaw and repeatedly jumped on his

3

genitals, limbs, and torso, causing Hartsaw's body to bounce 'like a trampoline.'

"After the beating was over, and at Lopez's instruction[,] other inmates dragged Hartsaw back to the floor near his bunk and placed his body in a position so that it appeared as if Hartsaw had fallen from his top bunk. Lopez also instructed the other inmates to clean up the area where the beating had occurred; while they were doing so, Lopez took a shower and sang 'loudly and happily.'

"Approximately 20 minutes after the beating was over, an inmate alerted guards that Hartsaw was down. Emergency personnel who responded were unable to resuscitate Hartsaw. A medical examination disclosed Hartsaw had suffered 18 rib fractures, 32 facial injuries, multiple facial fractures, two skull fractures, a fractured sternum, numerous internal injuries[,] and bleeding.

"Following Hartsaw's death, Lopez sent two notes or, in prison parlance, kites, to other inmates. One kite stated Lopez had already given 25 years of his life to the state, and it looked like the state might get the rest because Lopez was now facing murder charges. The kite stated: 'That fool was also a P.C.,' which was a reference to the fact Hartsaw was in protective custody and therefore presumably a child molester. According to Lopez's kite, Hartsaw showed Lopez paperwork which established that Hartsaw had been convicted of child molestation. The kite further stated Lopez 'took care of a fuck'n chomo [child molester] that aint gon hurt kids no more.' A second kite set forth Lopez's hatred of child molesters and stated that many 'who no do got respeto what I did.' The kites were signed 'Evil.'

"Lopez also sent a codefendant's girlfriend a letter in which he stated that he was sure her boyfriend told her what had happened and 'let's just say

4

"them people" aren't allowed, sabes?' " (*People v. Lopez, supra*, D065801; *People v. Lopez, supra,* D078176.)

DISCUSSION

I.     *Overview of Section 1172.6 Resentencing Procedure*

"The Legislature enacted Senate Bill [No. 1437 (2017–2018 Reg. Sess.)] 'to more equitably sentence offenders in accordance with their involvement in homicides.' (Stats. 2018, ch. 1015, § 1(b).) The Legislature recognized, 'It is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability.' (*Id.*, § 1(d).) With this purpose in mind, Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1(f).) Outside of the felony-murder rule, 'a conviction for murder requires that a person act with malice aforethought. A person's culpability for murder must be premised upon that person's own actions and subjective mens rea.' (*Id.*, § 1(g).)" (*People v. Curiel* (2023) 15 Cal.5th 433, 448.)

Senate Bill No. 1437 amended the definition of malice in section 188. (Stats. 2018, ch. 1015, § 2.) Amended section 188 states: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Senate Bill 1437 added subdivision (3) to section 189, which describes the new requirements for felony murder: "A participant in the perpetration

5

or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (Stats. 2018, ch. 1015, § 2.) Torture, punishable under section 206, is among the enumerated felonies for felony murder under section 189, subdivision (a).

Senate Bill 1437 created a procedure for eligible defendants to seek retroactive relief under the amended law. (*People v. Strong* (2022) 13 Cal.5th 698, 708.) Under section 1172.6, a defendant may file a petition with a declaration stating he or she is eligible for resentencing because he or she could not be convicted of murder or attempted murder based on the changes to section 188 or 189. (*Ibid.*) The trial court must evaluate the petition to determine whether the petitioner made a prima facie case for relief. If the petitioner states a prima facie case, the trial court issues an order to show cause and holds an evidentiary hearing. (§ 1172.6, subd. (c), (d)).

At the evidentiary hearing, the People have the burden to prove, beyond a reasonable doubt, that the petitioner is guilty of murder under the amended law. (§ 1172.6, subd. (d)(3).) If the trial court "finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951 (*Vargas*).)

Section 1172.6 "does not detail eligible degrees of murder. For relief it simply requires the defendant to have been convicted of 'murder, attempted murder, or manslaughter' in a situation in which the petitioner 'could not presently be convicted of murder or attempted murder' because of changes to section 188 or 189. (§ 1172.6, subd. (a)(2), (3).) . . . It treats all murder as a single, generic crime and requires resentencing when a defendant could not now be convicted of murder, generically." (*People v. Didyavong* (2023) 90 Cal.App.5th 85, 96.) A "generic murder" is a murder charge that does not specify a degree. (*People v. Jones* (2014) 230 Cal.App.4th 373, 377.) "A murder charged generically does not limit the prosecution to any particular theories of liability." (*Didyavong*, p. 96, fn. 4.) The statute authorizes the court to either grant or deny the petition. It does not provide a mechanism "to *reduce* a first degree murder conviction to second degree" (*id*, at p. 96) or, conversely, "to retry a defendant on a lesser homicide offense even if the evidence would support it." (*Id.* at p. 97.)

Because the trial court acts as an independent fact finder in deciding whether the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, we review the trial court's factual determination for substantial evidence. (*Vargas, supra,* 84 Cal.App.5th at p. 951.) "Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

7

II.   *Lopez Is Ineligible for Resentencing*

A.   *Evidentiary Hearing and Findings*

At the evidentiary hearing, the trial court received the transcripts and exhibits from the record of conviction and considered briefing and arguments from counsel.  Acting as an independent fact finder, the trial court determined the evidence "proves beyond a reasonable doubt that [Lopez] is guilty of first degree murder and is ineligible for resentencing."  The court found Lopez "was clearly the actual killer of decedent" and, additionally, that he "with the intent to kill, aided and abetted the other assailants of Hartsaw, and was a major participant in the underlying fatal assault, acting with reckless indifference to Hartsaw's life."

The court determined Lopez was the actual killer even though he was not the sole assailant of Hartsaw.  The court stated, "Numerous inmates were initially involved in punching, kicking and stomping Hartsaw.  However, in a particularly gruesome scene, the beating did, indeed, become a 'one-man show' when [Lopez] asked the group if they were having fun and said something to the effect of 'step aside and let me show you how it's done.' [Lopez] then viciously and methodically kicked and stomped the still-living, defenseless victim to death."

The court described the evidence and concluded it showed "beyond a reasonable doubt that [Lopez] killed another person with malice aforethought, in violation of Penal code section 187, and that the murder was murder of the first degree, with [Lopez] acting willfully, deliberately and with premeditation; by torture; after lying in wait or immediately thereafter; and/or by felony murder by torture.  [Lopez] was very clearly the actual killer

8

of decedent Hartsaw and is, therefore ineligible for the relief sought in his [p]etition."[3]

Lopez contends there is insufficient evidence to support the trial court's finding that he acted with intent to kill or that he was the actual killer. We disagree.

B. *General Principles For Murder*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice is "express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature" (§ 188, subd. (a)(1)) and is "implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart" (*id.*, subd. (a)(2)). Murder that is willful, deliberate, and premeditated, is first degree murder. (§ 189, subd. (a).) Both murder by torture and felony murder by torture are also first degree murder. (*Ibid.*)

" '[M]urder by means of torture under section 189 is murder committed with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain.' [Citation.] While section 189 does not require a premeditated intent to kill, it does require that the intent to inflict extreme and prolonged pain be the result of calculated deliberation." (*People v. Massie* (2006) 142 Cal.App.4th 365, 371–372 (*Massie*).)

C. *Evidence of Premeditation*

" ' " ' "[P]remeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful

---

3    At trial, the court had instructed the jury that Lopez was prosecuted for first degree murder under four theories: (1) the murder was willful, deliberate, and premeditated; (2) the murder was committed by torture; (3) the murder was committed by lying in wait; or (4) felony murder by torture.

9

thought and weighing of considerations for and against the proposed course of action." ' " [Citation.] " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88 (*Morales*).)

The Supreme Court described " 'three basic categories' of evidence" that are generally "sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what the defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" . . . .' " (*Morales, supra*, 10 Cal.5th at pp. 88–89.) These " ' "guidelines are descriptive and neither normative nor exhaustive" ' " but provide a framework to assist courts in appellate review. (*Id.* at p. 89.)

There is substantial evidence of planning, motive, and the manner of death to support the trial court's finding that Lopez killed Hartsaw willfully, deliberately, and with premeditation.

Lopez was the "tank captain" or shot caller for the Mexican inmates. Lopez spoke with Hartsaw and a deputy when Hartsaw moved into the cell. Lopez then told witnesses that Hartsaw would bunk with the Mexican inmates even though Hartsaw was not Mexican.

After Hartsaw arrived in the cell, Lopez spoke privately with several inmates in the bathroom. Lopez appeared upset and told one inmate he was not happy about Hartsaw being there because Hartsaw was a child molester. The inmate knew Lopez did not like child molesters because Lopez previously mentioned his sister had been raped. Lopez said he was "going to get it handled." He said, "I got me two volunteers and we'll take care of it." Thereafter, Lopez stopped by the bunks of inmates of different races to let them know that they were going to do something, so the other inmates should mind their own business and stay in their bunks.

Later that night, Lopez told Hartsaw to get up and "party like a rock star." At Lopez's direction, Hartsaw and several inmates snorted lines of a prescription medication that would get them excited.

 After a guard completed a security check and another inmate gave a "thumbs up" sign, Lopez punched Hartsaw in the face, knocking Hartsaw to the ground. Other inmates joined Lopez in beating, stomping, kicking, and dragging Hartsaw between bunks. Lopez gave commands to the other inmates during the beating. A witness said Lopez could not stomp as hard as he wished to because other assailants' feet were in the way and "everybody was taking a turn." A witness heard Lopez say that Hartsaw liked "putting kid's things in [his] mouth" and "we don't get down like that mother fucker." Another witness described hearing "bone-crushing" sounds.

Hartsaw was badly injured after the initial attack. His mouth was open and he had ragged and labored breathing.

11

Lopez asked the other inmates if they had "fun." Then Lopez alone resumed the attack on Hartsaw saying, "This is the way it's done." He kicked the victim with all his might between the legs, like he was kicking a soccer ball. Hartsaw moaned.

Lopez systematically stomped on Hartsaw's left elbow joint, head, neck, right elbow, right leg joint, genitals, abdomen, and sternum. Witnesses described Lopez's level of force as 10 out of 10, "brutal," "extreme," "over the top," and "sickening." Lopez stomped so hard that Hartsaw's body bounced off the concrete like he was on a trampoline.

Lopez also sat on Hartsaw's chest and punched his face over and over. Lopez spat on Hartsaw, saying "you piece of shit." Lopez then "finished" Hartsaw by stomping on his chest and saying, "you're a child molester."

After Lopez "finished him," Lopez moved Hartsaw back to his assigned bunk area and told the other inmates what to do to clean up. Lopez went to take a shower where he sang loudly and boisterously as if he was happy. Approximately 20 to 30 minutes after Lopez finished the assault on Hartsaw, when everyone was back in their bunks, an inmate was allowed to press the panic button.

Lopez admitted in written correspondence that he "took care of a fuck'n chomo that aint gon to hurt kids no more" and " 'them people' . . . aren't allowed . . . ."

This evidence shows Lopez killed Hartsaw with premeditation and deliberation. He planned and set in motion a chain of events that led to Hartsaw's death because he wanted to "take care of" a person he understood to be child molester. Lopez did not like child molesters because his sister was a victim of rape.

12

Lopez planned, directed, and participated in the first attack on Hartsaw. Lopez lured Hartsaw into a secluded area where he threw the first punch. He gave commands as he and other inmates participated in the initial attack. After asking the other inmates if they had fun, he said he would show them how it is done and then proceeded to beat and stomp Hartsaw to death.

Even if the other inmates thought they were only going to assault Hartsaw, Lopez did not stop with an ordinary prison "beat down" or "tune up." After a break, Lopez alone executed a second attack on the severely injured Hartsaw. The systematic, brutal, "over the top," and "sickening" way he conducted this attack showed Lopez intended to inflict extreme pain and did, in fact, "finish" Hartsaw.

Lopez's actions were, at a minimum, a substantial concurrent cause of Hartsaw's death. (*People v. Carney* (2023) 14 Cal.5th 1130, 1138–1139, 1141 [discussing proximate causation and defining "substantial concurrent cause"].) A defendant may be guilty of first degree murder even when there are multiple proximate causes of death. (*Id.* at p. 1144.) Hartsaw died from the combination of numerous severe blunt force injuries to his head and chest. Although the medical examiner could not determine the order of the injuries or precisely when Hartsaw died, the medical examiner opined that the injuries were acute, meaning they occurred before or around the time of Hartsaw's death. Lopez participated in inflicting those deadly wounds.

Evidence of the manner of the beatings, particularly the final beating, also supports an inference that Lopez intended to inflict extreme and prolonged pain after deliberation. (*Massie, supra*, 142 Cal.App.4th at p. 372.) Therefore, substantial evidence supports the trial court's finding that Lopez

13

is guilty of murder by torture as well as premeditated murder in violation of section 189.

Lopez contends the trial court's finding of premeditation is contradicted by the jury's acquittal on the conspiracy to commit murder charge. He relies upon cases where a trial court's findings at an evidentiary hearing contradicted a jury finding. (See *People v. Arnold* (2023) 93 Cal.App.5th 376, 386 [court finding that defendant stabbed the victim as the actual killer was inconsistent with the jury's not-true finding on a knife-use enhancement allegation]; *People v. Henley* (2022) 85 Cal.App.5th 1008, 1020 [court's finding that defendant used a firearm to commit an offense was inconsistent with a jury's not true finding on a personal firearm use allegation]; *People v. Cooper* (2022) 77 Cal.App.5th 393, 398 [court improperly denied resentencing based on a belief the defendant was a major participant in a kidnapping and acted with indifference to human life by carrying and firing a gun when the jury acquitted him of a firearm-possession offense].) There is no inconsistency here.

"Conspiracy ' "is an inchoate offense, the essence of which is an agreement to commit an unlawful act." ' [Citation.] This crime has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." (*People v. Ware* (2022) 14 Cal.5th 151, 163 citing § 182, subd. (a)(1).) "Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy. . . . ' "As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of]

agreement to commit a crime," and "thus reaches further back into preparatory conduct than attempt . . ." ' " (*People v. Morante* (1999) 20 Cal.4th 403, 416–417.)

The fact that the jury acquitted Lopez of conspiracy to commit murder means only that they did not find all the necessary elements for the inchoate crime, such as an agreement between two or more people with the specific intent to commit murder before the conduct commenced.

During deliberations, the jury asked if there was a difference between conspiracy and conspiracy to commit murder. The jury also asked, "What if it was a conspiracy to commit assault that turned into murder? Is it the same?" The court responded that the jury had to decide only the charge of conspiracy to commit murder. The court said whether Lopez conspired to commit an assault was not before the jury. A reasonable inference from the question and the acquittal of Lopez on the conspiracy count is that the jury thought the alleged co-conspirators may have agreed with Lopez to assault Hartsaw, but there was insufficient evidence that they reached an agreement to murder Hartsaw before they started the assault.[4]

The finding on conspiracy does not undermine the finding that Lopez acted with premeditation and deliberation to torture and murder Hartsaw. As discussed, there is ample evidence to support the inference that Lopez harbored an intent to kill Hartsaw from the outset, even if the other inmates

---

[4]    It is worth noting that before the case went to the jury the court granted the codefendant's motion for acquittal on the conspiracy to commit murder charge and reduced the charge to the lesser included offense of conspiracy to commit assault (§ 245). Shortly thereafter, the People dismissed the conspiracy count against the codefendant. Thus, Lopez was the only defendant facing a conspiracy to commit murder charge when the case was submitted to the jury.

only thought they were going to assault him.  The savage manner in which Lopez "finished" Hartsaw also shows he intended to torture and kill the injured Hartsaw.  " ' "[C]old, calculated judgment may be arrived at quickly . . . ." ' " (*Morales, supra,* 10 Cal.5th at p. 88.)

For these reasons, we conclude substantial evidence supports the trial court's finding that Lopez murdered Hartsaw willfully, deliberately and with premeditation and/or by torture.  Lopez is, therefore, ineligible for resentencing.

D.      *Evidence of Felony Murder by Torture*

Given our conclusion that Lopez is ineligible for resentencing because he is guilty of murder, it is unnecessary to reach the issue of whether he could also be convicted of felony murder under the current law.  Nevertheless, substantial evidence also supports the trial court's alternative finding that Lopez is guilty of felony murder by torture.

"The intent required for torture as defined in section 206 is not identical to the intent required for torture murder under section 189. [Citation.]  Torture under section 206 does not require premeditation and deliberation, and it does not require an intent to inflict prolonged pain." (*Massie, supra*, 142 Cal.App.4th at p. 372.)  The crime of torture under section 206 "has two elements (1) the infliction of great bodily injury; and (2) the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*Id.* at pp. 370–371.)  "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense. [Citations.]  Intent to cause cruel or extreme pain can be established by the circumstances of the offense and other circumstantial evidence." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)

16

The evidence about the manner of the attacks shows Lopez intended to inflict extreme pain and bodily injury on Hartsaw for revenge or a sadistic purpose (§ 206). This is reflected in the jury's conviction of Lopez for torture.

Under current law, Lopez could still be convicted of felony murder by torture. As discussed, substantial evidence supports the court's finding Lopez was the actual killer of Hartsaw, making him ineligible for resentencing under section 189, subdivision (e)(1). He planned the attack, started the attack, participated in the first attack, and then finished Hartsaw with the brutal second attack. (*Carney, supra,* 14 Cal.5th at p. 1145 [a person who is a substantial concurrent cause is guilty of murder]; *People v. Lopez* (2022) 78 Cal.App.5th 1, 17–19 [an actual killer is the person who personally kills the victim]; *People v. Harden* (2022) 81 Cal.App.5th 45, 57–58 [agreeing with *Lopez*].)

Additionally, Lopez was a major participant in the felony of torture and acted with reckless indifference to human life, making him ineligible for resentencing under section 189, subdivision (e)(3). As the trial court found, Lopez was "involved in all aspects of this fatal assault, from his agreement to accept Hartsaw into the module, to his assignment of a bunk to Hartsaw, to his pre-assault bathroom meeting with other assailants, to waking up Hartsaw to 'party like a rock star,' to his participation with other inmates in the initial assault, and to his fatal stomping and beating Hartsaw to death." Not only did Lopez plan the assault, but he was also present at the scene and participated in the killing. Despite the knowledge that Hartsaw was severely injured after the initial beating, Lopez took matters into his own hands to further torture Hartsaw and "finish" him by stomping on his chest. This evidence shows reckless indifference to human life. (*People v. Banks* (2015) 61 Cal.4th 788, 803; *People v. Clark* (2016) 63 Cal.4th 522, 618–622.)

Lopez contends the trial court erroneously referred to the underlying felony as an assault, which is not an enumerated felony listed in section 189, subdivision (a). However, because the court found Lopez was guilty of felony murder by torture, we conclude the court's reference to "assault" was merely a descriptive term for the actions perpetrated by Lopez and the other inmates rather than a reference to felony assault. Importantly, the prosecutor did not present a theory of felony murder by assault. The prosecutor only presented a theory of felony murder based on torture.

The record supports the trial court's finding that Lopez was both the actual killer and a major participant in the felony of torture. As such, Lopez is ineligible for resentencing. Given our conclusions, we need not decide whether Lopez could also be convicted of felony murder under an aiding and abetting theory.

DISPOSITION

The order is affirmed.

O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.

18