Filed 6/12/26  P. v. Williams CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DEVIN WILLIAMS, JR.,<br><br>        Defendant and Appellant. | A171962<br><br>(Alameda County<br>Super. Ct. No. 22-CR-010803) |

Devin Williams, Jr. (appellant), appeals from his convictions, following a jury trial, for the first degree murders of Maria Tran and Benison Tran.[1] We reject his evidentiary challenges and affirm.

BACKGROUND

In 2022, Maria and Benison were married and lived in a two-story house with their teenage son and Maria's cousin.  Appellant was a deputy sheriff.  In February, Maria and appellant began dating.  Between February and September, they exchanged about 50,000 text messages.  These text messages indicate that Maria initially told appellant she was divorced and no

---

[1] Because the victims share a last name, we refer to them by their first names.  No disrespect is intended.

1

longer living with her ex-husband. By the end of May, she admitted to appellant that she was still married but told him her husband lived in a separate house.

About 3:30 a.m. one morning in early August 2022, officers were dispatched to Maria and Benison's house. Appellant was outside their front door and told the responding officers that he found out his girlfriend might be married and came to her house to find out if she was cheating on him.[2] Maria initially told the officers that she did not know appellant, then subsequently acknowledged that appellant was her boyfriend but said she did not want her husband to hear.

At some point during their relationship, Maria gave appellant a password enabling him to look at all of her text messages, previous and current. In texts from early September 2022, appellant indicated to Maria that he was going through her old text messages. Maria and Benison had exchanged numerous text messages in July and August 2022 saying they loved each other and calling each other "honey" and "babe."

On September 6, 2022, Maria's mother and brother were visiting and staying with Maria and Benison. Maria and appellant texted numerous times between 9:00 p.m. and 11:40 p.m. that evening. During this time, appellant texted Maria, " 'I'm extremely scared about your ex-husband,' " later explaining, " 'I'm scared for three reasons. One, you going back to him. Two, you cheating on me with him. Three, your love being divided between us. Do you send your ex-husband emojis like kissing face, heart eyes, multiple heart face?' " Appellant asked, " 'If I let you talk to him however you want, other than sexual, then you won't do any intimate things with him, no

---

[2] Excerpts from the officers' body camera footage from this incident were admitted into evidence.

kissing like this or sex or anything intimate that satisfies him. Could that be acceptable?'" A little later, Maria told appellant that she was going to change her passwords so he would no longer have access to her accounts. Appellant said that she should trust him and that he would not go through her information without asking. Appellant told Maria he needed her to comfort him, and said he was about to " 'snap' " and " 'explode.' "

Around 11:20 p.m., appellant arrived outside Maria and Benison's house. During the next 20 minutes, he called Maria 20 times. By midnight, everyone in the house but Benison had gone upstairs to go to bed. Around 12:15 a.m., appellant walked up the driveway carrying a phone and with what appears to be a pistol grip sticking out of his pants pocket.[3] At 12:21 a.m., appellant called Maria and they spoke for a little over 15 minutes. At 12:37 a.m., appellant walked to the front door, which was open, and entered the house.

Maria's cousin, mother, and brother all heard Maria and Benison calling for Maria's brother, and came out of their bedrooms. Appellant was in Maria and Benison's bedroom with a gun in his hand. Appellant told Maria she was cheating on him, and Maria told appellant she never wanted to see him again. Appellant was visibly upset and Maria's mother tried to calm him down. Benison told appellant to leave or he would call the police, and walked downstairs to get his phone. Appellant told Maria, " 'If he's calling the cops, I'm gone.' " Benison began walking back up the stairs, talking to a 911 operator on speakerphone. When Benison was in the middle of the staircase, appellant shot him. Benison fell down the stairs and Maria and her brother ran after him. Maria hugged Benison as he lay on the ground, and appellant

---

[3] Video clips from Maria and Benison's security cameras were admitted into evidence.

came down the stairs and shot both of them in the head. Appellant then ran out of the house. Later that day, appellant turned himself in. Maria and Benison died from their injuries.[4]

In closing arguments, defense counsel did not dispute that appellant killed Maria and Benison, but argued he did so in the heat of passion after discovering that Maria was still in a romantic relationship with Benison.

The jury convicted appellant of the first degree murders of Maria and Benison. The trial court sentenced appellant to an aggregate term of 50 years to life.

## DISCUSSION

### I. *Photographs*

Appellant argues the trial court erred in admitting certain photographs. We reject the challenges.

As an initial matter, with respect to six of the photographs challenged by appellant on appeal—photographs of Maria's brother taken at the crime scene—appellant fails to establish that he objected to their admission below.[5] "Generally, a 'trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal.'" (*People v. Guenther* (2024) 104 Cal.App.5th 483, 525.) Appellant

---

[4] We omit evidence submitted in appellant's defense, which is not relevant to our resolution of the issues on appeal.

[5] In contending there was no forfeiture, appellant relies on a defense counsel argument that in fact related to a photograph depicting an injury to Maria's arm, not to the photographs of her brother. The photographs of Maria's brother were not part of the group of photographs addressed at the in limine hearing.

4

offers no explanation or basis for an exception to this general rule. Accordingly, his challenge as to these photographs is forfeited.[6]

Appellant challenges the admission of three photographs of the victims, arguing they are irrelevant and more prejudicial than probative.[7] The challenged photographs are a still image from the body camera of the first responding officer showing Maria's brother attempting to resuscitate Benison, a photograph of the victims lying at the foot of the staircase, and a photograph of Maria lying on a blue plastic sheet with blood on her face.

" 'Whether the trial court erred in admitting into evidence the challenged photographs of the murder victims depends upon two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in determining that the probative value of each photograph outweighed its prejudicial effect.' [Citation.] We review the trial court's decision to admit the photographs for abuse of discretion. [Citation.] ' "The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect." ' " (*People v. Morales* (2020) 10 Cal.5th 76, 103 (*Morales*).) Appellant has not established an abuse of discretion.

Appellant argues the photographs were not relevant because he did not dispute that he shot Maria and Benison, and did not contest the witnesses' account of how the shooting occurred. Similar challenges to the admission of crime scene photographs have been repeatedly rejected. "Defendant asserts

---

[6] We need not decide whether, as the People contend, appellant's challenges to the other photographs are also forfeited.

[7] Although appellant's briefing identifies two additional photographs—one of the crime scene and one from the autopsy—these photographs were not admitted into evidence.

5

that the manner and cause of the victims' deaths and the intent of the perpetrator were not disputed at trial; rather, the only seriously contested issue was the perpetrator's identity, and the photographs were irrelevant to that question. But defendant's not guilty plea put in issue all of the elements of the charged offenses, including the elements he conceded. [Citations.] Thus, the prosecution was 'still entitled to prove its case and especially to prove a fact so central to the basic question of guilt as intent.' [Citations.] Defendant also contends that the manner of restraint and the cause of death were amply described in oral testimony; therefore the photographs were cumulative. But a prosecutor is not required to rely solely on oral testimony when a visual image would enhance the jury's understanding of the issues." (*People v. Cowan* (2010) 50 Cal.4th 401, 476; see also *People v. Lewis* (2001) 25 Cal.4th 610, 641 (*Lewis*) ["Although defendant contends the photographs were inadmissible because they had no bearing on the only disputed question at trial (his mental state), we have made clear that the absence of a defense challenge to particular aspects of the prosecution's case or its witnesses does not render victim photographs irrelevant"]; *Morales, supra*, 10 Cal.5th at p. 104 ["We have previously rejected the argument that 'photographs are irrelevant or inadmissible simply because they duplicate testimony, depict uncontested facts, or trigger an offer to stipulate' "].)

Appellant also contends the challenged photographs are more prejudicial than probative. " ' "[V]ictim photographs and other graphic items of evidence in murder cases always are disturbing." ' [Citation.] A trial court may admit photographs of victims even when the photographs are 'gruesome' if 'the charged offenses were gruesome' and the photographs '[do] no more than accurately portray the shocking nature of the crimes.' [Citations.] 'The jury can, and must, be shielded from depictions that sensationalize an alleged

6

crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors.'" (*Morales, supra,* 10 Cal.5th at p. 104.) We have reviewed the challenged photographs and find, as did the *Lewis* court, that "[a]lthough the blood-splattered surroundings and the images of the victims depicted in the photographs . . . are disturbing to view, as such evidence always is [citation], none of these exhibits is unduly gruesome or inflammatory." (*Lewis, supra,* 25 Cal.4th at p. 642.)

II.     *Evidence Regarding a Sound on Victims' Security Video*

Appellant challenges evidence relating to a sound heard on the victims' security camera on the night of the shootings. We reject the challenges.

A.     *Additional Background*

In one of the security camera videos played for the jury, a sound is audible at about 12:27 a.m., during a time when appellant was outside Maria and Benison's house but not visible on the camera. Over appellant's objection, a peace officer opined that the sound was "a slide racking on a handgun." He testified the basis for his opinion was, "I've racked the slide thousands of times, and it just has a very distinct sound to it."[8]

The People also presented a video of the peace officer racking the same type of gun used by appellant. This reenactment video was recorded by the same security camera at the victims' house. The officer testified he believed the sounds on the two videos were the same. Defense counsel questioned the officer about certain differences between the sounds, as well as differences in the time of day and ambient noise levels of the two videos. Defense counsel

---

[8] At a prior hearing, the trial court ruled this testimony was admissible as lay opinion.

7

also established on cross-examination that none of the security videos from the night of the shooting showed appellant with the gun in his hand.

During closing arguments, defense counsel argued the sound on the original video was "completely different" than the sound on the reenactment video, and played both videos three times. Counsel argued the sound was instead possibly the opening and closing of a metal latch on a gate next to the victims' garage.

During deliberations, the jury asked for the original and reenactment videos.

### B.     *Reenactment Video*

Appellant argues the reenactment video was unreliable because, as established during the officer's cross-examination, the officer did not know appellant's precise location, the weather conditions, the level of ambient noise, or the condition of the camera microphone on the night of the shooting. Appellant relies on a case discussing the *Kelly*/*Frye* standard,[9] whereby, " ' "when faced with a novel method of [scientific] proof," ' our Supreme Court requires ' "a preliminary showing of general acceptance of the new technique in the relevant scientific community" before the scientific evidence may be admitted at trial.' " (*People v. Hardy* (2021) 65 Cal.App.5th 312, 324.) "*Kelly*/*Frye* ' "is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not." ' " (*Id.* at p. 325.)

The reenactment video here was not a new scientific technique, but simply capturing a known sound on a security camera in order to compare it to an unknown sound captured on the same security camera. Defense

---

[9] (*People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013.)

counsel cross-examined the peace officer at length about the limitations of the reenactment. "[T]here was no danger that the jury was swept away by the presentation of a new scientific technique which it could not understand and, therefore, would not challenge." (*People v. Hood* (1997) 53 Cal.App.4th 965, 970 [holding computer animation of a shooting did not need to meet *Kelly/Frye* requirements].)

C. *Opinion Testimony*

Appellant argues the peace officer's testimony about the source of the sound on the security video from the night of the shooting was speculative and not a proper subject for lay opinion testimony. We need not decide whether the admission of this testimony was error because any error was harmless.

The original security video and reenactment video were played for the jury multiple times—including by defense counsel during closing arguments—and the jury was able to compare the two sounds and determine for themselves whether they were the same. The jury was properly instructed with respect to witnesses' opinions that they were "not required to accept those opinions as true or correct" and "may give the opinions whatever weight you think appropriate." (See CALCRIM No. 333.) Accordingly, any error in the admission of the officer's testimony opining as to the source of the sound on the original security video was harmless. (See *People v. Leon* (2015) 61 Cal.4th 569, 601 [rejecting challenge to lay opinion testimony identifying person on a security video as the defendant in part "because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant"]; *People v. Larkins* (2011) 199 Cal.App.4th 1059, 1068 ["the jurors were able to test the manager's opinion that defendant was the person in the 20 to 30 videos because they saw still

9

photos taken from some of the videos and they could test his ability to correctly identify defendant in the three videos they were shown"].)[10]

## DISPOSITION

The judgment is affirmed.

SIMONS, Acting P. J.

We concur.

BURNS, J.
CHOU, J.

(A171962)

---

[10] We reject appellant's claim of cumulative error.  As the only assumed error we have found is the admission of the peace officer's testimony about the source of the sound on the original security video, there is no error to cumulate.